Per Curiam:
This case was referred to Trial Commissioner Harry E. Wood with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Pule 134(h). The commissioner has done so in an opinion and report filed on June 9, 1971. Defendant filed a notice of intention to except to the commissioner’s opinion, findings and report on July 9,1971, but on July 16,1971, filed a withdrawal of said notice and a request that the court adopt the report as written. On July 20,1971, plaintiff filed a motion requesting that the court adopt the *304 commissioner’s findings of fact, opinion and recommended conclusion of law as the basis for its judgment in this case.
Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby grants the requests and motion of the parties and adopts the same, with a minor deletion, as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover for a living quarters allowance and judgment is entered for plaintiff accordingly with the amount of recovery to be determined pursuant to Rule 131(c). Plaintiff is not entitled to recover for round-trip travel allowances, interest, or costs, and as to such claims his petition is dismissed.
OPINION OP COMMISSIONER*
Wood, Commissioner:
Plaintiff, a civilian employee of the Department of the Navy in London, England, from January 2, 1963 to March 1969 (and in Washington, D.C. thereafter to time of trial in September 1970), here seeks to recover “living quarters allowances and roundtrip travel allowances” incident to his said overseas employment.[1]
Plaintiff’s claim to a living quarters allowance turns on whether or not, at the time of his employment by the Navy, he was “temporarily in the foreign area for travel * * within the meaning of Section 031.12d, Department of State Standardized Eegulations (Government Civilians, Foreign Areas) (hereafter “the Standardized Eegulations”). For reasons which follow, it is concluded that an affirmative answer to that question is required, and that plaintiff is entitled to judgment on such claim.[2] For reasons also set forth below, it is further concluded that plaintiff bas failed to establish any right to “roundtrip travel allowances”, and that his petition should be dismissed as to such claim.
*305 I
The stated purposes of the Overseas Differentials and Allowances Act of 1960, 74 Stat. 792, 5 U.S.C. §§ 3031-3039 (Supp. Y, 1959-63), were to improve and strengthen the administration of overseas activities of the United States by
(1) providing a means for more effectively compensating Government employees for the extra costs and hardships incident to their assignments overseas,
(2) providing for the uniform treatment of Government employees stationed overseas to the extent justified by relative conditions of employment,
(3) establishing the basis for the more efficient and equitable administration of the laws compensating Government employees for the extra costs and hardships incident to their assignments overseas, and
(4) facilitating for the Government the recruitment and retention of the best qualified personnel for civilian service overseas.
In implementation of those purposes, the said Act declared, among other things, that “Whenever Government-owned or Government-rented quarters are .not provided without charge for an employee in a foreign area, [a living quarters allowance] may be granted to such employee where applicable”, and that such allowance “shall be paid in accordance with regulations prescribed by the President establishing rules governing payments thereof * * [3]
The relevant language of Section 031.12 of the Standardized Regulations, effective April 2, 1961, and promulgated pursuant to the 1960 Act,[4] is as follows:
Quarters allowances * * * may be granted to employees * * * recruited outside the United States, provided that
* * * * *
d. the employee was temporarily in the foreign area for travel or formal study and immediately prior to such travel or study had resided in the United States * * *.
*306 A “foreign area” is defined by the Standardized Regulations as “any area * * * situated outside the United States * * *"
II
Plaintiff, born in West Virginia in 1925, spent the years from about 1931 to 1945 in Yugoslavia. In the latter part of 1945 he went to Italy, and, in 1946, in Naples, he was inducted into the United States Armed Forces. He returned to the United States in 1948, was discharged from military service in April 1949, in August 1949 went to California, and in 1953 moved to Santa Monica, California.
Plaintiff worked for Douglas Aircraft Company, in Santa Monica, from 1951 to 1961. In 1953 or 1954, his mother moved from Yugoslavia to Santa Monica, at first living with plaintiff but later obtaining her own apartment nearby. In mid-1961, she lived on 10th Street in Santa Monica, some ten blocks from plaintiff’s apartment on 20th Street. Plaintiff’s brother was then serving with the United States Air Force in England.
From 1958 to 1960, plaintiff had been assigned to a Douglas project in England. In June 1961, he took steps to return there. He was furnished a letter from Douglas certifying to the satisfactory nature of his services with that company; he renewed his passport; he requested (and obtained) a leave of absence for approximately 90 days (including “authorized vacation”),[5] and he transferred $8,350 from the Los Angeles Branch of the Bank of America to its London Branch.
Plaintiff then flew to England, landing at London Airport June 29, 1961. Prior to departing the United States, he left some personal property with his mother; he took overseas only a couple of suitcases and his golf clubs. On or shortly after reaching England, he had decided to stay in Europe as long as the money he had transferred to London lasted, intending, when the money ultimately ran out, to return to the Santa Monica area.
*307 ' About the time plaintiff reached England, his brother received military orders returning him to the United States.[6] Plaintiff stayed with his brother (and his brother’s family) for several weeks, then moved into a rooming house in London run by a friend (Mr. Jovanovich) of a friend (Mr. Nedovich). Mr. Nedovich lived at 53 Blenheim Crescent, London, about a block and a half from Mr. Jovanovich’s house. Plaintiff did not live at 53 Blenheim Crescent at any time during the period June 29, 1961 to January 2, 1963, but for most of this period he did use that address as his mailing address.[7]
Plaintiff remained in the London area from June 29, 1961 to August 20, 1961. He then went to Scotland and, later, to several countries on the Continent. His trips to the Continent were broken by several returns to the United Kingdom. His general locations between August 20,1961 and December 14, 1962 are listed in finding 11(a). During this period, he stayed varying amounts of time in any particular geographical area. Of the approximately 18 months between his arrival in London and his employment by the Navy, he spent a total of about a year in the United Kingdom and about 6 months on the Continent.
Plaintiff did not maintain a room in London during his stays on the Continent. While in London, he usually stayed in various rooming or guest houses. Elsewhere, he usually stayed in a rooming or guest house, a pub, a pension, or a hotel. During this period he was engaged primarily in recreational activities and in exploring the “cultural aspects” of the United Kingdom and Europe.
On August 16, 1962, while in London, plaintiff filed a Standard Form 57 with the United States Naval Activities Command, London. The SF 57 listed California as his legal or voting residence. On the lines calling for his address, plaintiff placed, without any qualification, 53 Blenheim *308 Crescent, London.[8] He stated on the SF 57 (and in substance reaffirmed at trial) that he had come to England to visit his bi’other and to have a prolonged vacation.
In October 1962, in response to a notice from the Superior Court, Los Angeles, California, to report for jury duty, plaintiff indicated that he believed his “overseas travels * * * [would] last for another five or six months”, but that since the notice indicated he would not be summoned for jury duty prior to February 1, 1963, he “would like to express my willingness to participate in this honorable duty if I can possibly return home before the above mentioned date.” Cf. finding 27.
About December 10, 1962, with his money running low, plaintiff went to Paris. He testified that he went there “to buy myself a ticket and go back home.” He did not buy a ticket, however, nor did he decide on a definite port of departure, and it is reasonable to infer from the record that his plans for returning to the United States were still tentative at this point in time.
On December 13 or 14, 1962, while in Paris, plaintiff had a telephone conversation with Mr. Nedovich, in London. During the conversation, plaintiff learned that the Department of the Navy wanted him to “come in for an interview.” He thereupon called the Navy Consolidated Industrial Relations Office (hereafter ciro) in London, and he returned to London December 14, 1962, for an interview with onto. Within a few days thereafter, plaintiff was advised that he had been selected for the position of Plant Account Clerk, at a salary of $4,565 per annum, and he entered on duty with the Navy in London January 2, 1963.
Plaintiff processed a good deal of paperwork in connection with his employment, including an application for a living quarters allowance. Findings 18-19,22. The said application was denied. Plaintiff’s prolonged and persistent efforts to secure a different result, delineated in the findings, have been unsuccessful. The stated bases for reaffirmance of the initial disapproval of the application reveal shifts in emphasis from time to time, but the fundamental reason for the several administrative denials of plaintiff’s claim to a living quarters *309 allowance is that, because of his 18 months’ absence from the United States, plaintiff was not “temporarily in the foreign area for travel * * *” at the time of his employment by the Navy. See, e.g., findings 26, 29, 34, 37(e).
III
Imprecision and vagueness are apparent from the regulatory implementation of the statutory scheme.[9] In light of this, the prolongated history of the issue of plaintiff’s eligibility for a quarters allowance, and the record now before the court, whether the congressional intent to establish a more efficient, equitable, and uniform, administration of the laws concerning overseas differentials and allowances has been effectuated would seem debatable.[10]
In passing upon plaintiff’s eligibility for a living quarters allowance, the test applied by the Navy Department — though perhaps not framed in these exact words — was whether plaintiff was a more or less permanent resident in the foreign area prior to, or solely by reason of, his federal civilian employment. This test is entirely consonant with the- spirit of the law. Indeed, Senate Report No. 1647, 86th Cong., 2d Sess. (1960), to accompany the bill which became the Act of September 6, 1960, supra, reflects, inter alia, that “Either a quarters allowance or free Government quarters are furnished to each American citizen civilian employee living in a foreign area 'by reason of his employment by the U.S. Government.”
In the difficult task of evaluating plaintiff[1]’s eligibility for a living quarters allowance within that proper framework, however, it is concluded that the Navy Department erred.
Plaintiff’s purposes, from or shortly after the very outset of his overseas journey, cannot seriously be doubted. He *310 went to England to see his brother and to have a prolonged European vacation, intending, when his money ultimately ran out, to return to the United States in general and to the Santa Monica area in particular. He left his mother, and some personal property, in the area to which he intended to return. His means of subsistence were finite (though at the outset not insubstantial), but for more than a year he made no effort whatever to obtain employment, and he never made what could fairly be called concerted efforts in that direction.
He had no fixed place of abode overseas.[11] He traveled extensively, lodging in places of a transient nature. His time and energies were devoted to recreational and cultural activities. So far as the record shows, he had no relatives or visible ties in England (or in Europe) following his brother’s return to the United States in mid-1961. In October 1962, well prior to any indication of a federal job offer, he stated in writing his intention to return to California in the near future.[12] And, there is evidence that just prior to his federal employment, he was in the process, if only tentatively, of doing just that.[13]
The issue is a very close one, in view of the considerable length of plaintiff’s overseas stay,[14] and not all the bits and pieces of the record move the pointer on the scales in the same direction. It is concluded, however, that the picture which emerges from careful record analysis is of one plainly not fleetingly or momentarily, but nonetheless “temporarily”, in a foreign area for travel at the time of his federal employ- *311 meat. If, as defendant urges, an 18-month absence from the United States is presumptively inconsistent with being temporarily in a foreign area for travel, the proof satisfactorily refutes the presumption.
Defendant further argues that, since both statute and regulation contain permissive rather than mandatory language, denial of plaintiff’s application for a living quarters allowance cannot, in light of the discretion thus vested in the Navy Department, be considered arbitrary or capricious. The argument lacks merit. Plaintiff met the requirements of the Standardized Regulations, and, but for its erroneous decisions to the contrary, the Navy admittedly would have paid him a living quarters allowance. Plaintiff’s right to recover flows, not from a showing of any abuse of discretion, arbitrariness or capriciousness, but from proof of deprivation of statutory and regulatory rights on an invalid basis. Cf. Vallesteros v. United States, 125 Ct. Cl. 218 (1953).
Defendant also suggests an absence of “need to pay quarters allowance to plaintiff to persuade him to live in England because he was already there and obviously was not inconvenienced nor found it too costly to live there”,[15] and asserts that the “6 months ‘rule of thumb’ * * * applied administratively by the Department of the Navy * * * should be adopted by the Court.”[16] Neither assertion is persuasive.
That plaintiff was in England at the time of his employment, and that he had been able to support himself from savings overseas, have no real relevance to a proper resolution of the question in suit. And, defendant’s “rule of thumb” is in fact but an unwritten “thought” by one Navy office (and of no other affected government agency, so far as the record shows) in the application of the Standardized Regulations; it scarcely rises to the level of an administrative interpretation here entitled to deference. Cf. Zuber v. Allen, 396 U.S. 168, 192-93 (1969); Udall v. Tallman, 380 U.S. 1, 16 (1965).
IV
Plaintiff’s claim to “roundtrip travel allowances” rests on Section 7 (a) of the Administrative Expenses Act of 1946, *312 60 Stat. 806, as amended, 5 U.S.C. § 73b-3 (a) (Supp. V, 1959-63), now codified without substantive change as 5 U.S.C. § 5728 (Supp. V, 1965-69). Briefly, the section authorized payment of the expenses of round-trip travel, from overseas post of duty to “place [s] of actual residence at time of appointment”, of an employee who had satisfactorily completed an agreed period of service overseas and who was returning to his actual place of residence to take leave before serving another tour of duty overseas under a new written agreement made prior to departing from his overseas post.
Under both the statute and the relevant Navy Civilian Personnel Instructions in evidence (finding 3(b)), any right to payment of the expenses of round-trip travel depends on considerably more than having an “actual place of residence” in the United States. Plaintiff’s argument largely ignores the further terms of the statute and regulations, focusing instead solely on whether his “ ‘place of actual residence’ at time of hire was in the United States or must be considered to have been London, England.”[17]
Plaintiff’s thesis that ciro’s (and the Navy’s) position on plaintiff’s eligibility for a living quarters allowance are invalid, and that giro’s conclusion respecting his “actual place of residence?’ is therefore also necessarily defective, may be pretermitted. Cf. Weible v. United States, 244 F. 2d 158, 163 (9th Cir. 1957). For, plaintiff has in any event failed in other significant respects to bear the burden of showing his entitlement, under statute and regulations, to round-trip travel allowances. Whether or not plaintiff’s place of actual residence at time of appointment was his mother’s home in San Pedro, California, as plaintiff asserted on December 19, 1962, or elsewhere in the United States, the record made leaves to sheer speculation other necessary elements of proof. Cf. Smith v. United States, 165 Ct. Cl. 233 (1964); Schremp v. United States, 143 Ct. Cl. 663, 166 F. Supp. 610 (1958); 49 Comp. Gen. 425 (1970); findings 3,38. Accordingly, plaintiff’s petition should be dismissed as to such claim.
*313 FiNdiNgs oe Fact
1. (a) In this action, plaintiff, a civilian employee of the Department of the Navy in London, England, from January 2, 1963 to March 1969 (and in Washington, D.C. thereafter to time of trial in September 1970), sues to recover “living quarters allowances and roundtrip travel allowances” incident to-his said overseas employment, “plus interest and costs.”[1]
(b) By agreement of the parties, and with the approval of the trial commissioner, trial of this case was limited to the issues of law and fact relating to plaintiff’s right to recover, reserving determination of the amount of recovery, if any, for further proceedings.
2. (a) Section 203, Title II, Act of September 6, 1960, 74 Stat. 792, 793, 5 U.S.C. § 3035 (Supp. V, 1959-63),[2] provided in pertinent part that:
_ The allowances and differentials authorized by this title shall be paid in accordance with regulations prescribed by the President establishing rules governing payments thereof * * *.
(b) Section 211 of the said Act[3] provided in pertinent part that:
Whenever Government-owned or Government-rented quarters are not provided without charge for an employee in a foreign area, one or more of the following quarters allowances may be granted to such employee where applicable:
% ifc # *
(2) a living quarters allowance * * *.
(c) Authority to prescribe regulations pertaining to payment of allowances and differentials authorized by Title II of the said Act was duly delegated by the President to the Secretary of State. Executive Order 10903, January 9, 1961, 26 Fed. Reg. 217, 5 U.S.C. § 3035 (1964).
*314 (d) Section 031, Department of State Standardized Regulations (Government Civilians, Foreign Areas), effective April 2, 1961, provided in pertinent part as follows:
031 United States Citizen Employees
031.1 Quarters Allowances
031.11 Employees Becrulted in the United States
*****
081.12 Employees Becruited Outside the United States
Quarters allowances * * * may be granted to employees * * * recruited outside the United States, provided that
a. the employee’s actual place of residence in the place to which the quarters allowance applies at the time of receipt thereof shall be fairly attributable to his employment by the United States Government; and
% ij« ífc if: Jfe
d. the employee was temporarily in the foreign area for travel or formal study and immediately prior to such travel or study had resided in the United States, * * *.
(e) Section 040, “Definitions” of the Standardized Regulations provided in part that:
f. “Foreign area” means any area * * * situated outside the United States, * * *.
(f) Department of the Navy regulations in evidence supplementing Section 031 of the said Standardized Regulations relate only to categories of personnel not here relevant.
3. (a) Section 7(a) of the Administrative Expenses Act of 1946, 60 Stat. 806, as amended, 5 U.S.C. § 73b-3 (a) (Supp. V, 1959-63) [4] provided in pertinent part that:
* * * expenses of round trip travel of employee * * * from their posts of duty outside the continental United States to the places of actual residence at time of appointment * * * shall be allowed in the case of persons who have satisfactorily completed an agreed period of service overseas and are returning to their actual place of residence for the purpose of taking leave prior to serving another tour of duty at the same *315 or some other overseas post, under a new written agreement entered into before departing from the overseas post: * * *.
(b) Section 5-6, Navy Civilian Personnel Instructions 4650, March 9, 1962, provided in pertinent part as follows:
* * * commanding officers of activities located outside the continental United States may enter into original employment agreements with persons hired locally who are residents of the continental United States * * * if the places of actual residence of such persons are located outside the area of employment * * *. The employee himself has no legal entitlement to an original employment agreement * * *. The period of service provided in the original employment agreement shall be that applicable to the activity. * * * Upon completion of the terms of the original employment agreement, the employee is entitled to expenses * * * for round-trip travel and transportation under a renewal employment agreement. * * *
* * ❖
An employee who has been determined to be a resident of the United States at the time he is hired locally overseas * * * is entitled upon his request to round-trip travel for purposes of leave prior to serving an additional tour of overseas duty under a renewal employment agreement when he has been in continuous employment equivalent to the tour of duty of the area whether or not an original employment agreement has been negotiated with him. * * *
4. Plaintiff was born in Gary, West Virginia on October 2, 1925. From about 1931 to early in World War II, he lived in Berane, Yugoslavia with his mother 'and 'brother. He remained in Yugoslavia throughout World War II. In the latter part of 1945, plaintiff and his brother went to Italy, and there made contact with United States officials. On May 28, 1946, in Naples, Italy, both were inducted into the United States armed forces. After serving in the armed forces in Europe for some 2 years, plaintiff returned to the United States in 1948, and was discharged from military service April 1, 1949.
5. In or about August 1949, plaintiff moved to the Los Angeles, California area, and in January 1953, he moved to Santa Monica, California. In 1953 or 1954, plaintiff’s mother returned from Yugoslavia to the United States and *316 joined him in Santa Monica, at first living with plaintiff, but then obtaining an apartment nearby.[5] In mid-1961, plaintiff resided at Apartment 8, 848 20th Street, Santa Monica, and his mother resided about ten blocks away, at 820-B 10th Street, Santa Monica. Some time after June 1961, plaintiff’s mother moved to 1041 First Street, San Pedro, California.
6. Plaintiff worked for Douglas Aircraft Company in Santa Monica from 1951 to 1961. His first employment was as a “Timekeeper”; in 1954 he was promoted to “Timekeeper Leaderman”. From 1958 to 1960, he was assigned to a Douglas project in England as “Accounting Group Leader-Foreign Permanent”, at the equivalent of a GS-12 rating, with responsibility for supervising payroll, travel, and property accounting activities for the project. Upon returning to Santa Monica in 1960, he resumed the job of “Timekeeper Leaderman”.
7. (a) On June 5, 1961, Douglas Aircraft prepared and furnished to plaintiff a letter certifying to plaintiff’s employment with Douglas, and advising that liis “services have been entirely satisfactory during his employment with this Company.” His salary at the time was $2.82 per hour.
(b) On June 5, 1961, the Los Angeles Passport Agency, Department of State, “hereby renewed” plaintiff’s passport, which had expired in September 1960, for two additional years.
(c) On or about June 14, 1961, plaintiff requested that Douglas approve a leave of absence from July 3, 1961 to September 17, 1961; the stated reason for the request was “Going to London to make legal contact relative to family property in Yugoslavia”. Plaintiff was “authorized 90 day leave — return date with authorized vacation 9-18-61.”
(d) On June 21,1961, plaintiff transferred from the Bank of America, Los Angeles, California, to the Bank of America in London, England, the net amount of $8,350. The “Re-mitter’s Receipt” listed plaintiff’s address as 820-B 10th Street, Santa Monica, California.
*317 (e) Plaintiff then went to England, via Pan American Airways, at his own expense, arriving at London Airport June 29, 1961.[6] Prior to departing the United States, plaintiff left some personal property (described as “stereos, furniture, you know, bits and pieces”) with his mother in Santa Monica.[7] He took overseas only a couple of suitcases and his golf clubs.
8. In June 1961, plaintiff’s brother (still then serving in the Air Force) was stationed in England. At trial, plaintiff testified that the purpose of his trip to England was to visit his brother, and to travel and enjoy himself. Cf. finding 7(c), supra. Plaintiff at least “contemplated” remaining outside the United States for an extended period from the outset, admitting that whether he would return to Douglas in September 1961, was, in June 1961, “debatable”. In any event, on or shortly after reaching England, he had decided to stay in Europe as long as the money he had transferred to London lasted, intending, when the money ultimately ran out, to return to the Santa Monica area.
9. Plaintiff’s employment with Douglas Aircraft Company was terminated effective September 20, 1961. In response to Navy form letters addressed to Douglas in December 1962, Douglas gave as “Reason for Termination” “Leaving country” on one form, and “Quit-Absent without leave” on another.
10. At or about the time plaintiff reached England, plaintiff’s brother received military orders assigning him to duty in the United States, with processing for departing the United Kingdom to begin August 17, 1961. Plaintiff stayed with his brother (at Ruislip Hardens) for perhaps 4 or 5 weeks. He then moved into a rooming house in London owned by one Mr. Jovanovich, whom he met through Milorad *318 Nedovich.[8] Mr. Nedovich lived at 53 Blenheim Crescent, London, in a two-room flat with his wife and two children. Mr. Jovanovich’s rooming house was about a block and a half from Mr. Nedovich’s home. Plaintiff did not live with Mr. Nedovich at 53 Blenheim Crescent at any time during the period June 29, 1961 to January 2, 1963.
11. (a) According to the best evidence available, plaintiff remained in the London area from June 29, 1961 to August 20, 1961. Thereafter, his general locations during the period ending December 14, 1962, are set forth below:
Period: Place
Aug. 20, 1961 to Oct. 30,1961. Scotland.
Oct. 30,1961 to Nov. 7, 1961— Paris.
Nov. 7,1961 to Dec. 10,1961— London.
Dec. 10,1961 to Dec. 23,1961-Switzerland.
Dec. 23, 1961 to Mar. 4, 1962-England.
Mar. 4,1962 to Apr. 16,1962-Apr. 15,1962 to May 15,1962-France. Austria and Bavaria.
May 15,1962 -to June 1,1962— June 1,1962 to July 30,1962-Germany. Italy.
July 30,1962 to Aug. 7,1962— Switzerland and France.
Aug. 7, 1962 to Oct. 22,1962_ England and Scotland.
Oct. 22,1962 to Oct. 31,1962_ Rotterdam, Paris, LeHavre.
Oct. 31,1962 to Dec. 10,1962-London.
Dec. 10,1962 to Dec. 14,1962-Paris.
Dec. 14, 1962_ Returned to London.
(b) During his periods in London between August 1961 and December 14, 1962, plaintiff usually stayed in various rooming or “guest” houses; in Scotland and Northern England he usually stayed in a rooming house or a pub. Elsewhere, he stayed .in hotels, pensions, or guest houses. The period of time he stayed in a particular “house” varied with the time spent at any given geographical location; for example, he once stayed in Nome for approximately 2 months in a “pensiona.” During this period, he was engaged primarily in recreational activities and in exploring the “cultural aspects” of the United Kingdom and Europe.
*319 '(c) While away from London between August 1961 and December 14, 1962, plaintiff did not maintain a room in London. He took Ms personal property with him on such travels.
(d) Until his brother’s return to the United States in August 1961, plaintiff used his brother’s address in England as a mailing address; thereafter, to late 1962, he used, with permission, Mr. Nedovich’s address, 53 Blenheim Crescent, London, as a mailing address.
(e) Mr. Nedovich sometimes forwarded plaintiff’s mail to him in care of the American Express office in a city designated by plaintiff; he was sometimes asked by plaintiff, during the course of a telephone conversation, to open plaintiff’s mail and read the contents to plaintiff; and he sometimes held mail for plaintiff’s “direction.”
(f) Of the roughly 18 months between plaintiff’s arrival in England June 29,1961, and his employment by the Navy January 2,1963, about a year was spent in the United Kingdom and about 6 months was spent, intermittently, on the Continent.
12. In October 1961, plaintiff purchased an Austin Healey Sprite Mark II automobile. The car was purchased “For final export after tax-free use in U.K. to * * * U.S.A.” Documents pertaining to the purchase, including the order form, sales contract, and bill of sale, allude to “Road Fund Taxation” charges for 4 months. The sales contract contemplated “final export within the permitted period of tax-free use” as a prerequisite to exemption from Purchase Taxes.
13. Between July 1961 and December 1962, plaintiff received some unsolicited job offers in Europe, but did not accept them.
14. On August 15, 1962, plaintiff obtained a new passport from the United States Embassy, London. At time of trial, the passport bore three “Bearer’s Address [es] in the United States”: first, 820-B 10th Street, Santa Monica; second, 1041 First Street, San Pedro, California; and third, an address on Mayfield Avenue, Los Angeles. Plaintiff’s mother resided at the first address in 1961, and, sometime later, at the second one; plaintiff was unable at trial to recall the identity -of the resident at the third address. “Bearer’s Foreign Address” *320 (to which, at an unestablished time, plaintiff subsequently-added “Mailing”) was listed as 53 Blenheim Crescent, London.
15. On August 16, 1962, plaintiff filed with the United States Naval Activities Command, London, a Standard Form 57, Application for Federal Employment. On the SF 57, plaintiff listed 53 Blenheim Crescent, London, on the lines calling for a street, number, and city; his “Legal or voting residence” was listed as California. The SF 57 also reflected, inter alia, that plaintiff “will accept appointment only in * * * London or Other European Offices” ; that he had been unemployed since September 1961; that he “Came over here to visit my brother * * * [who] is a member of USAF and was stationed at South Ruislip. Later I made trips to Italy, Swiss, Germany, France and Austria”; and that his “Reason for leaving” Douglas Aircraft Company in September 1961, was “Personal — Visiting family here and having prolong[ed] vacation.”
16. By letter dated October 12, 1962, plaintiff acknowledged a notice dated July 11, 1962, from the Superior Court, Los Angeles, California, and mailed to plaintiff at 848 20th Street, Santa Monica, to appear for jury duty examination on July 18, 1962. Plaintiff’s letter stated that the reason for his belated receipt of the notice was
* * * my overseas travels, which I believe will last for another five or six months. Since, according to your letter, I will not be summoned for actual jury service before the 1st February 1963,1 would like to express my willingness to participate in this honorable duty if I can possibly return home before the above mentioned date. In the event that I am unable to do so I beg to be relieved of this responsibility * * *
17. (a) Toward the latter part of 1962, the funds in plaintiff’s London bank accomit had diminished to less than $1,500. About December 10, 1962, he went to Paris, taking his personal belongings including his car with him. Plaintiff testified that he went to Paris “for a couple of days to buy myself a ticket and go back home”; he had not decided, at that point, on a port of departure, however, and he did not purchase a ticket to return to the United *321 States. It is reasonable to infer from the record that plaintiff’s plans for returning to the United States were still tentative at this point in time.
(b) On December 13 or 14, 1962, while in Paris, plaintiff called Mr. Nedovich in Dondon, and was told that Nedovich had a letter from the Navy to plaintiff. The letter, which Nedovich opened and read to plaintiff, requested that plaintiff “come in 'for an interview.” Plaintiff thereupon called the Navy Consolidated Industrial delations Office (hereafter ciro) in London and, on December 14, 1962, returned to London for an interview. Within a few days after the interview, plaintiff was advised that he had been selected for employment with the Navy in London, and that he should start processing the necessary paperwork.
18. (a) In a signed statement dated December 19, 1962, “To Whom It Mat Concern”, and then furnished to defendant in London, plaintiff stated in part that:
Please be informed that the address as shown on the form 51 (under paragraph :£fc4)[9] is not my residence. It is the address solely for mail purposes only. My residence address is as follows: 1041 — 1st Street, San Pedro, California.
P.S.
The reason for my being here is that of a visitor and tourist. I came here to pay a visit to my brother and his family who is a member of USAF and stationed at South Kuislip. [Compare finding 15.]
(b) Plaintiff lived at 25 Inverness Terrace, London, from December 14, 1962, through February, and perhaps March, 1963.
(c) The address given as his “residence address” on December 19, 1962, was one to which his mother had moved following plaintiff’s departure from the United States in June 1961.
19. Plaintiff also completed by hand (probably on December 19,1962, although precisely when is unclear) a “Personal Data Form and Application for Quarters Allowance”. He listed as his “Local Residence” 53 Blenheim Crescent, London; the “From” and “To” portions of this item were not completed. As his “Last official and/or legal residence in *322 the United States (list only that location at which you actually resided)”, he listed “848-20th Street (Apt.-8)”, from July 1, 1960 to June 25, 1961. No city or state for the said address was furnished on this form. Plaintiff also completed Section V of the form as follows:
V. Explain circumstances which brought you to this country
a. Date of arrival June 29,1961
}fc sfc # * *
d. Specific reason for coming to this country To pay a visit to my brother and his family (U'SAE member) and to have a prolonged] vacation.
iji % if! * #
20. A onto memorandum, dated December 21, 1962, reflects in part that on December 20, 1962, plaintiff called the Employment Officer, cmo, concerning the status of his “application for consideration for quarters allowance * * that plaintiff was advised that the Employment Officer had not received written notification of plaintiff’s selection for employment, but that on receipt of “proper notification * * * I would inform him and clarify the points he had raised regarding whether or not he would get an allowance for quarters”; that plaintiff had requested, should quarters allowance be denied, that he “be placed in the grade at a step higher than the 'basic one”; and that plaintiff had been advised this was impossible.[10]
21. By letter dated December 27,1962, addressed to plaintiff at 53 Blenheim Orescent, London, ciro informed him that he had been selected for the position of Plant Account Clerk, at a salary of $4,565 per annum, with direurmideast-docks, London.[11] He was requested to, and did, report to ciro for “indoctrination purposes” January 2, 1963, and on the same day entered on duty with the Navy.
22. On January 2, 1963, plaintiff executed a Standard Form 85, Security Investigation Data for Nonsensitive *323 Position, and two forms of designation of beneficiary (for purposes of unpaid compensation and Federal Employees’ Group Life Insurance, respectively). On the SF 85, plaintiff listed his last two dates and places of residence as 53 Blenheim Crescent, London, from June 29, 1961 to “present”, and 848 20th Street, Santa Monica, California, from July 7, 1960 to June 1961. Both forms of designation of beneficiary show an address for plaintiff of 53 Blenheim Crescent, but it appears probable that giro, not plaintiff, placed the said address on the forms.
23. An eurmideastdocks office directory, dated January 14, 1963, reflects plaintiff’s home address as 25 Inverness Terrace, London.
24. On January 14, 1963, plaintiff’s passport was “amended” by the American Consul to show that plaintiff was a member of the civilian component of a force of the United States for purposes of the Agreement regarding the Status of Forces of Parties to the North Atlantic Treaty. The entry was noted, and recognition of plaintiff as such a member approved, by the British Home Office March 11, 1963.[12]
25. Some time prior to February 6, 1963, plaintiff’s “Personal Data Form and Application for Quarters Allowance” was endorsed by Mr. Donald K. Holster, Consolidated Industrial Delations Officer, to reflect that plaintiff’s eligibility for a living quarters allowance was disapproved. The decision thus recorded, made after review by Mr. Holster of plaintiff’s personnel folder and without discussion with plaintiff, was unaccompanied by any statement of reasons for disapproval.
26. In response to a request from direurmideastdooks “for a written statement regarding the disapproval” of plaintiff’s application for a living quarters allowance, giro, by memorandum dated February 12, 1963, advised direturmideastdocks in part that plaintiff had arrived in the United Kingdom June 29, 1961; that his SF 57, filed August *324 16, 1962, listed 53 Blenheim Crescent as his address; that plaintiff’s Personal Data Form and Application for Quarters Allowance, prepared after plaintiff’s memorandum of December 19, 1962 (finding 18(a), supra) also listed 53 Blenheim Crescent as plaintiff’s local residence; that plaintiff’s said Personal Data Form and Application for Quarters Allowance listed 'as his “Last official and/or legal residence in the United States” an address (848 20th Street, Apartment 8)[13] conflicting with the “residence address” (1041 First Street, San Pedro, California) furnished by plaintiff December 19, 1962; that, during a conversation with curo on December 20, 1962, plaintiff had (a) first indicated that he “thought” his brother was at “South Ruislip with SAC”, (b) upon being advised that South Ruislip was not a SAC base, had then stated that his brother was “possibly” at High Wycombe, and (c) had then “suddenly remembered” that his brother was in the United States; that statements on plaintiff’s SF 57 regarding (a) termination of his employment with Douglas Aircraft Company, and (b) his salary at Douglas were in conflict with, respectively, plaintiff’s memorandum of December 19, 1962, and advice from Douglas ; and that (emphasis in original):
[State Department Standardized Begulations provide] the criteria by which living quarters allowances may be granted to employees recruited outside the United States.* * * [plaintiff] might if otherwise eligible, qualify under either criteria (a) or (d) of [the Standardized Regulations].* * * [plaintiff’s] presence in the United Kingdom since June 1961 can in no way be considered as being fairly attributable to his employment by the United States Government and criteria (d) * * * provides that an employee may be granted the LQA provided that the employee was temforarily in the United Kingdom for travel or formal study and immediately prior to such travel or study had resided in the United States * * *. [Plaintiff’s] presence for a period of eighteen months prior to his employment with the United States Navy can hardly be considered as temporary. Furthermore, the facts set forth in proceeding [sic] paragraphs hardly support his allegation that he has been a tourist in the United Kingdom.
*325 ciro further stated that, under these circumstances, and in view of its interpretation that the provisions of the Standardized Regulations “should be rigidly enforced,” plaintiff’s application for a living quarters allowance could not be approved by giro, but that that office would, on request, “be most happy to refer his case to the Chief of Industrial Relations for disposition.”
This decision was also made by Mr. Holster after review of plaintiff’s personnel folder and without discussion with plaintiff.
27. On March 6,1963, in a communication to plaintiff not in evidence, direttrmideastdocks advised plaintiff that his “request for living quarters allowance” had been disapproved. On March 15, 1963, plaintiff addressed a letter to the Chief of Industrial Relations requesting that his “case be reviewed and an allowance authorized * * Plaintiff’s said letter stated, inter alia, that he had been “in the foreign area as a tourist under the immigration laws of the countries listed below * * listing the periods and places set forth in finding 11(a), supra.) and that:
b. The purpose of my first stay in England was to pay visit to my brother (and his family) who, as a member of USAF, was stationed at South Ruislip, England. ** * On one of my last two visits to London (while making preparations for the homeward journey to California) [compare findings 15, 16, supra] * * * I submitted Standard Form 57 * * * to the Office of Industrial. Relations * * *. In Paris, while making final arrangements for departure from LeHavre to New York, I was informed that giro was trying to contact me regarding an interview ****** j returned to London for the interview which resulted in my employment by the Federal Government on 2 January 1963.
c. The purpose for my travel to other countries was to visit various museums, galleries, opera houses, places of historical significance, different local festivals, theatres, etc.* * *.
3. I do not believe it justifiable to disapprove my request for living quarters allowance * * *.
28. (a) Plaintiff’s letter of March 15,1963, was forwarded to the Chief of Industrial Relations via (1) direurmideastdocks, (2) giro (for the Commander, U.S. Naval Activities, *326 United Kingdom), and (3) the Chief, Bureau of Yards and Docks.
(b) giro added as enclosures to the basic letter copies of ciro’s February 12,1963, memorandum, plaintiff’s SF 57, SF 85, and Personal Data Form and Application for Quarters Allowance, and several other documents, “to provide the Chief of Industrial Delations with all documents which constituted the basis upon which the determination was reached in this case”, and said in part that:
[ciro’s memorandum of February 12, 1963, (finding 26, supra) ] presents clearly the basis upon which [plaintiff’s] application for living quarters allowance was disapproved. * * * The primary issue in this case concerns the question as to when an individual is or is not a tourist for purposes of granting living quarters allowance. In [plaintiff’s] case it is clearly evident that he was residing in the United Kingdom regardless of his legal status under British immigration law. The fact that he had at various intervals visited the Continent as a tourist has no bearing or effect on his status or eligibility for living quarters allowance when being employed in London.
ciro’s endorsement was signed by Mr. Holster.
(c) The Chief, Bureau of Yards and Docks, in forwarding the matter to the Chief of Industrial Delations, observed that “The Bureau concurs with the ciro decision * *
29. By letter dated April 25,1963, signed by Mr. William E. Gerow “By direction”, the Chief of Industrial Delations advised plaintiff in part that:
$ $ $ $ $
2. A review of the information submitted with [plaintiff’s letter of March 15, 1963 (finding 27, supra) ] and the endorsements thereon indicates that you lived in the United Kingdom from 29 June 1961 until the time of your employment with the Navy in London. Although you traveled to various places in the United Kingdom and in Europe, you returned to London for different periods of time. Too, on * * * Standard Form 85, you indicated that 58 Blenheim Crescent was your residence from 29 June 1961 to 2 January 1963. This address was also shown on your * * * Standard Form 57.
3. * * * On the basis of the inf ormation in paragraph 2, above, it is considered that at the time of your employment you had been residing in the United Kingdom for *327 approximately eighteen months. Thus, it is not considered that you were temporarily in the area for travel.
30. (a) Under billing date of February 29,1964, the State of California Franchise Tax Board gave notice to plaintiff that “in view of your failure to file a return for the taxable year shown below”, tax liability for tax year 1961 in the amount of $15.00, plus penalty of $7.50 and interest of $1.67, or a total of $24.17, had been estimated from available information. Demand for immediate payment of the total assessment was made.
(b) On June 4,1964, the California Franchise Tax Board acknowledged March 15,1964, receipt of plaintiff’s remittance of $24.17, in full satisfaction of his 1961 “liability.” A tax form and instructions were enclosed for plaintiff’s convenience in filing a return for the year 1963. Plaintiff was advised that, if “you are outside California for other than a temporary or transitory purpose, you became a nonresident of California for income tax purposes upon leaving this State”, and that a nonresident was taxable only upon income from sources within the State, but that “If * * * outside California for a definite temporary purpose, intending to return here when that purpose is accomplished, you are taxable as a resident on your entire income regardless of the source from which derived.”
(c) On June 8,1964, plaintiff transmitted to the California Franchise Tax Board a 1963 California Individual Income Tax Return and a postal money order for $29, along with Form OD805Q (Change of resident status).
31. (a) On July 8, 1964, in response to a direurmideast-docks request of May 27, 1964, cero advised diretmideast-docks in pertinent part that plaintiff was “considered to be, prior to * * * appointment, in the area for reasons not covered within the scope of the criteria” under which locally hired personnel might become entitled to round-trip travel to the United States for purposes of leave under a renewal employment agreement and be eligible for home leave, and that plaintiff was, therefore, not entitled to such benefits.
(b) By letter dated August 13,1964, from direurmideast-docks to plaintiff, and captioned “Notification of ineligibility for home leave and non-entitlement to round trip travel to *328 the United States for purposes of leave under a renewal employment agreement”, plaintiff was advised that “both the above entitlements are directly related to residency, * * ; that ciRO had ruled plaintiff’s “place of actual residence” at the time of hire was London, England; and that plaintiff was “accordingly ineligible” for round-trip travel and home leave.
32. On August 18, 19.64, the Registrar of Voters Department, Los Angeles County, California, acknowledged receipt of plaintiff’s request for an Absent Voter’s Ballot, advising plaintiff that the ballot would be sent to him October 5, 1964. Plaintiff’s “Voter’s Stub”, signed by him, lists as his residence 1165 South Bundy Drive, Los Angeles, California, an address not mentioned elsewhere in the record. It is reasonable to infer from the record that plaintiff did not vote in California elections between June 29, 1961, and mid-1964.
33. (a) By letter of September 16, 1964, to the Commander, U.S. Naval Activities, United Kingdom, plaintiff requested reconsideration of his application for a living quarters allowance. In the said letter plaintiff stated that his permanent residence, on January 2, 1963, was 1041 First Street, San Pedro, California; that he came to Europe June 29, 1961, “to travel and visit”; that he was “about ready to leave” France to return to the United States when he was asked to come to London for the interview resulting in his employment with the Navy; that he had visited London on various occasions but had never resided there; and that 53 Blenheim Crescent was a “convenience”, mailing, address only.
(b) On September 22, 1964, the Director, European-Mid East Division, Bureau of Yards and Docks, forwarded plaintiff’s letter of September 16, 1964, to the Commander, U.S. Naval Activities, United Kingdom, with the following endorsement : “On the basis of the arguments presented * * * in the basic letter, it appears that [plaintiff] has a strong case for reconsideration of the determination which denied him a Living Quarters Allowance.”
(c) On September 30, 1964, plaintiff’s said letter was forwarded by the Commander, U.S. Naval Activities, United Kingdom, via the Chief, Bureau of Yards and Docks, to the *329 Chief of Industrial Relations. The Commander, U.S. Naval Activities, United Kingdom, noted that he found “nothing in this latest submission * * * which would change the original ruling * * The Chief, Bureau of Yards and Docks, stated that it did not appear “that the factors * * * initially used as the basis for denying LQA. * * * have been changed * * *.
(d) In a memorandum dated October 1, 1964, the Industrial Eelations Officer, giro, London, stated that, during a telephone conversation with plaintiff at 10:15 a.m. that day, plaintiff had stated that “You know, this job was second choice. I was going to take a job in Paris”, and that this statement would seem to contradict plaintiff’s claim that he was in Paris “arranging transportation to the United States.”
(e) On October 19, 1964, Mr. William E. Gerow, for the Chief of Industrial Relations, expressed the opinion that plaintiff “is not eligible for a living quarters allowance for the reasons stated in” prior letters dated April 25, 1963 (finding 29, supra) and June 18,1964[14] of the Chief of Industrial Eelations; that whether plaintiff’s address prior to appointment with the Navy was or was not 53 Blenheim Crescent had no bearing; and that “The fact remains that he was a local recruit who had been in the local area for nearly 18 months with occasional trips to other countries.”
(f) Plaintiff was advised of the foregoing decision of the Chief of Industrial Relations October 30, 1964.
34. In a letter of February 8,1965, to the Chairman, Subcommittee on Constitutional Eights, United States Senate, plaintiff stated, inter alia, that he had never been a resident of England; that his “legal address” in December 1962 was 1041 First Street, San Pedro, California; that prior to January 2, 1963, he had spent some 2 months visiting his brother, and the next 16 months “traveling over Europe”; that he still voted and paid taxes in California; and that he was being “more or less treated as a ‘second class’ citizen.” Plaintiff’s said letter was transmitted to the Department of the Navy April 22, 1965. By letter dated May 10, 1965, the *330 Under Secretary of the Navy [15] advised the Chairman, Senate Subcommittee on Constitutional Eights, in part, that plaintiff “was not recruited in the United States and his presence in the European area for a period of approximately eighteen months prior to his appointment with the Navy can hardly be considered as temporary”, and that, accordingly, plaintiff had been denied a living quarters allowance.
35. With one minor exception, there is no indication in the record that plaintiff ever sought, or was ever given, any advice respecting completion of any of the forms mentioned hereinabove in connection with his overseas employment.[16]
36. (a) Mr. Donald K. Holster, a civilian employee of the Department of the Navy with 25 years’ service, and at trial Director of Industrial Relations, United States Naval Shipyard, Portsmouth, New Hampshire, was called as a witness for plaintiff.
(b) Mr. Holster was, from April 1962 to July 1963, Consolidated Industrial Relations Officer, Naval Support Activity, in London. Findings 25, 28. His responsibilities then included making determinations of eligibility for payment of living quarters allowances. The “Personal Data Form and Application for Quarters Allowance” plaintiff executed in late 1962 had been developed by Mr. Holster during a prior tour as Industrial Relations Officer in Italy, and he continued to use it in London. The said form was furnished to each United States citizen recruited by the Navy “locally overseas.” The two offices in which he served controlled all (some 40) Naval activities in Europe with the exception of those in Spain.
(c) Mr. Holster viewed living quarters allowances not as a right but rather as “something which management may pay as a recruitment incentive.” He was of the opinion that no one not eligible for such allowances should receive them. He testified that budgetary considerations had no effect on the grant or denial of living quarters allowances; that voting, payment of taxes, property ownership, and banking arrangements were not “a consideration of quarters allowance” and *331 that he did not employ, and was not aware of the use of, a “rale of thumb” involving any set period of time.
(d) During the 1962-63 period Mr. Holster anted on plaintiff’s case on more than one occasion. In making his determinations on plaintiff’s application for a living quarters allowance, Mr. Holster followed his general practice of reviewing the application form and other forms submitted by plaintiff. In this case he did not seek, as he sometimes did, to obtain clarifying information by discussion with the employee whose eligibility he was considering.
(e) Mr. Holster testified at trial that plaintiff’s right to recover herein turns on whether or not plaintiff was, when employed, “temporarily in the foreign area for travel * * *” and that, had he reached an affirmative conclusion on that question, plaintiff would have been granted a living quarters allowance.
(f) Mr. Holster testified at some length at trial in September 1970, with respect to his several determinations on plaintiff’s application for a living quarters allowance in 1963. Such testimony demonstrates vividly the difficulties of articulating bases for written determinations made some years earlier, but casts no real light (beyond that shed by the determinations themselves) on the issues here in suit.[17] The most that can fairly be drawn from his testimony in this area is that, in 1962, plaintiff “was living there [in London] in my opinion.”
37. (a) Mr. William E. Gerow, a civilian employee of the Department of the Navy with over 25 years’ service, and at trial Director, Career Management Division, Office of Civilian Manpower Management, Department of the Navy, was called as a witness for plaintiff.
(b) Mr. Gerow was, from 1962 to 1968, Assistant Director for Industrial Relations, Department of the Navy. His responsibilities then included “the whole question of quarters and allowances and other types of differentials * * and he was personally involved whenever a dispute or controversy in this area arose.
*332 (c) Mr. Gerow acted on plaintiff’s case on more than one occasion. Findings 29, 33 (e), 34, n. 15. On each such occasion, he reviewed plaintiff’s complete file. His office made no “independent investigation”, but did give consideration to everything submitted by either plaintiff or his overseas Naval activity in reaching a decision. He saw no relevant factual conflict in the materials available to him in plaintiff’s case.[18]
(d) Neither Mr. Gerow, nor his assistant, who normally prepared a “final reply” for him, subject to revision and rewriting if Mr. Gerow did not concur in the determination, was a lawyer, but legal counsel was available to them for assistance if this seemed to them to be required. Mr. Gerow did not know whether or not legal advice had been sought in plaintiff’s case by his assistant; he himself apparently did not seek such advice. His office also had an “overseas specialist” whom Mr. Gerow asked to review plaintiff’s case on one occasion.
(e) Mr. Gerow agreed that plaintiff’s right to recover herein turns on whether or not plaintiff was, when employed, “temporarily * * * * in the foreign area for travel * * His office “thought” in terms of a general, unwritten, rule of thumb for travel, that “If it is less than six months it is probably clearly temporary. If it is longer than six months it may very well not be temporary.”[19] His determinations in plaintiff’s case, however, were made on the basis of his review of the entire file, and not on the “general rule of thumb,” Which did not in any event apply to one “temporarily in the foreign area for * * * formal study * * [20] His basic reason for the determinations was the opinion that plaintiff was not in “London because of his employment with the Navy Department when he went to work for us, nor was he there for temporary travel * *
(f) There is no evidence of formal coordination between government agencies, or of a central file of determinations of *333 such agencies, respecting Section 031.12 of the Standardized Regulations.
38. The record contains no evidence respecting plaintiff’s completion of an “agreed period of service overseas”, of a “new written agreement entered into” by him overseas, of the “period of service * * * applicable to the activity,” of the “tour of duty of the area”, of a request by plaintiff for round-trip travel allowances or home leave, or of any incurrence by plaintiff of expense, following January 2, 1963, for travel between London and the United States. Compare findings 3, 31.
Conclusion of Law
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to judgment for a living quarters allowance, with the amount of recovery to be determined in further proceedings pursuant to Rule 131 (c). The court further concludes as a matter of law that plaintiff is not entitled to judgment for round-trip travel allowances, interest, or costs, and as to such claims his petition is dismissed.
In accordance with the opinion of the court, a memorandum report of the commissioner and a stipulation of the parties, it was ordered on October 29,1971 that judgment for the plaintiff be entered for $9,687.31.

 With a minor deletion by the Court.

 Plaintiff’s Brief also asserts a claim to “interest and costs.” The claim is neither supported by citation of authority nor justified. 28 U.S.C. § 2516(a) (1964) ; Rash v. United States, 175 Ct. Cl. 797, 810-11, 360 F. 2d 940, 947 (1966), and cases there cited.

 Trial was limited to the issues of law and fact relating to plaintiff’s right to recover, reserving determination of the amount of recovery, if any, for further proceedings.

 Sections 203, 211, Title II, Act of September 6, 1960, supra,, now codified as 5 U.S.C. §§ 5922(e), 5923 (Supp. V, 1965-69).

 See Executive Order 10903, January 9, 1961, 26 Red. Reg. 217, 5 U.S.C. § 3035 (1964).

 Plaintiff's stated reason for requesting the leave of absence was “Going to London to make legal contact relative to family property in Yugoslavia.” His scheduled “return date” was September 18, 1961. Douglas terminated his employment September 20, 1961, subsequently giving as reasons “Leaving country” and “Quit-Absent without leave.” Bindings 7(c), 9.

 Plaintiff’s brother left England in August 1961.

 On December 19, 1962, plaintiff furnished defendant a "written statement that 53 Blenheim Crescent was not his residence, but his address for mail only. His “residence address”, he said, was 1041 First Street, San Pedro, California. Plaintiff had never lived at that address; his mother had moved there from Santa Monica following June 29, 1961. On December 19, 1962, plaintiff was living at 25 Inverness Terrace, London. His statement did not mention the latter address, nor did it indicate where he had in fact been living since June 29, 1961.

 Plaintiff similarly completed several other forms given to defendant in December 1962 and January 1963.

 Rinding 2(d). Explication of the language of Section 031.12a is fortunately unnecessary here; the parties are essentially agreed that, as noted above, the case turns entirely on Section 031.12d.

 The Navy Department official whose responsibilities included overseas differentials and allowances “thought” in terms of an unwritten 6-month rule of thumb: “If it is less than six months it is probably clearly temporary. If it is longer than six months it may very well not be temporary.” The CIRO officer who first acted on plaintiff’s application did not employ, and was unaware of, any such “rule of thumb.” Whether other government agencies thought, or acted, in the same or similar terms does not appear. There is no evidence of formal coordination between government agencies, or of a central file of precedents of determinations of such agencies, respecting Section 031.12.

 It should perhaps be noted that plaintiff’s only “abode” In the united States in 1963 was in San Pedro, California, to which location his mother had moved following June 29,1961.

 Plaintiff’s arguments that he “continued" to pay state income taxes, and to vote by absentee ballot, are unconvincing. The evidence Indicates that plaintiff failed to file a state income tax return for 1961, and that he did not file such a return for 1963, until 1964, by which time (a) the Issue in suit had arisen, and (b) California authorities had gotten in touch with him. The absentee ballot evidence, too, relates to 1964. Nothing in the proof suggests that plaintiff voted, or tried to vote, in any state or congressional elections between mid-1961 and 1964.

 Parenthetically, the latter factor, standing alone, would seem insufficient to justify any valid conclusions as to the underlying nature of one’s prior presence in a foreign area. Moreover, the problems inherent in reliance on any such ratio decidendi are patent.

 In determining whether one was “temporarily in the foreign area for * * * formal study * * *" the Navy Department did not apply any particular time frame; such study could clearly involve a longer period of time than that here in suit.

 Defendant’s Brief, pp. 49, 53.

 Id., p. 54.

 Plaintiff’s Brief, p. 48.

 Plaintiff’s Brief, pp. 2, 16.

 Codified, without substantive change, as 5 U.S.C. 1 5922(e) (Supp. V, 1965-69).

 Codified, without substantive change, as 5 U.S.C. §5923 (Supp. V, 1965-69).

 Codified, without substantive change, as 5 U.S.C. § 5728 (Supp. V, 1905-60).

 Except for one unidentified year spent with plaintiff’s brother, plaintiff’s mother resided in. California from 1953 or 1954 to about 1967 or 1968, when she again joined plaintiff, this time in London, England. At time of trial, she resided with plaintiff in Arlington, Virginia.

 On arrival, British immigration authorities endorsed plaintiff’s passport "Permitted To Land On Condition That The Holder Does Not Remain In The united Kingdom Longer Than Three Months And Does Not Enter Any Employment Paid Or Unpaid”. The words "Three Months” were entered by hand; the balance was stamped on the passport. This condition was “varied” September 28, 1961, so as to permit plaintiff to remain in the United Kingdom to December 29, 1961. Several subsequent passport entries prior to 1963 are of a similar nature.

 His mother continued to keep his personal property until about 1967 or 1968, when she went to London to live with plaintiff. The personal property was then placed in storage in California.

 Plaintiff had met Mr. Nedovicli In. tlie winter of 1942, in Yugoslavia, lost contact with him in 1944, and met him again in London during plaintiff’s 1958-60 stay in England.

 53 Blenheim Crescent, London.

 The memorandum (Plaintiff’s Exhibit 33) also refers to “a brother with the USAE at Ruislip as * * * stated on his application for quarters allowance.” The only application for quarters allowance in evidence contains no such statement. Rinding 19; cf. finding 18(a). Plaintiff’s “Designation of Persons to be Notified in Case of Emergency”, handwritten and undated, names his brother and lists as his address Homestead Air Force Base, Florida.

 Director, European-Mid East Division, Bureau of Yards and Docks.

 In August 1964, plaintiff, in aid of ills claim, asked the British Home Office whether his presence in England “prior to my change of landing conditions was consistent to your Department as residence or a temporary visit.” On September 14, 1964, the Home Office replied that, when granted recognition on March 11, 1963, plaintiff was “considered to be not ordinarily resident here for the purpose of such recognition.”

 Plaintiffs failure to provide a city location for this address was also noted.

 The thrust of the June 18, 1964, decision was that plaintiff’s case was not similar to that of another Navy employee whose living quarters allowance had been terminated but later restored.

 Mr. Gerow reviewed plaintiff’s case In connection with the Congressional Inquiry.

 Plaintiff did testify that he sought, and received, permission to use a 3-year salary average on his SF 57.

 As Mr. Holster said, several years had “transpired since I looked at this case.” He repeatedly qualified his answers by such words as assume, presume, suspect, believe, suppose, appear, think, possible, probable, and the like; he also responded to many questions that he did not recall, remember, or know.

 Whether or not plaintiff resided at 53 Blenheim Crescent was, he testified, “really not of great consequence. * * * The key issue was whether or not he was in a temporary travel situation.”

 He did not know whether other government agencies employed a similar “rule”.

 He testified that “formal study” could last as long as i or 5 years.