**John McBRYDE, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 01–5146.**

United States Court of Appeals,
Federal Circuit.

Aug. 6, 2002.

David Broiles, Wells Purcell & Kraatz, of Fort Worth, Texas, argued for plaintiff-appellant. With him on the brief was Arnon D. Siegel, Robbins, Russell, Englert, Orseck & Untereiner LLP, of Washington, DC.

Shalom Brilliant, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General and David M. Cohen, Director.

Before NEWMAN, LOURIE and CLEVENGER, Circuit Judges.

Opinion for the court filed by Circuit Judge CLEVENGER. Dissenting opinion filed by Circuit Judge PAULINE NEWMAN.

CLEVENGER, Circuit Judge.

The Honorable John McBryde ("Judge McBryde") appeals from a decision of the Court of Federal Claims granting summary judgment to the United States on his claim for reimbursement of legal expenses incurred in pursuing a mandamus action to the United States Court of Appeals for the Fifth Circuit. *See McBryde v. United States,* 50 Fed. Cl. 261, 267 (2001). Be-

cause we conclude that the trial court correctly interpreted and applied 28 U.S.C. § 463 and the Compensation Clause of the United States Constitution to the undisputed facts of this case, we affirm.

## I

Judge McBryde is an active judge of the United States District Court for the Northern District of Texas. The roots of this case lie in a dispute over Judge McBryde's handling of two cases originally assigned to his docket: *United States v. Satz,* No. 4:94–CR–094–A ("*Satz*") and *Torres v. Trinity Industries Inc.,* No. 4:90–CV–812–A ("*Torres*"). Judge Jerry Buchmeyer, who was then the chief judge of the Northern District of Texas, being not content with Judge McBryde's conduct on the bench, transferred both *Satz* and *Torres* from Judge McBryde's docket to his own. The underlying facts of the two cases, as well as the chain of events that led to their removal from Judge McBryde's docket, are well documented elsewhere and will not be repeated here. *See In re McBryde,* 117 F.3d 208 (5th Cir.1997).

After the cases were transferred, Judge McBryde filed a "Request for Assistance" under 28 U.S.C. § 332(d)(1) with the Fifth Circuit Judicial Council seeking to have the two cases returned to his docket. In response to Judge McBryde's request, Judge Politz, then chief judge of the Fifth Circuit, issued an order forming a committee to "review, investigate, and report its recommendations on the matter brought before the Council by Judge McBryde, concerning the reassignment...."[1] The committee decided against Judge McBryde

---

1. The same committee also conducted a separate investigation of various allegations of misconduct against Judge McBryde brought to the Judicial Council's attention by third parties, including the Department of Justice.

*See McBryde v. Comm. To Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States,* 264 F.3d 52, 54–55 (D.C.Cir.2001).

on his request for reassignment, and the Judicial Council issued an order invoking its own authority under 28 U.S.C. § 332 to reassign the *Satz* and *Torres* cases to Chief Judge Buchmeyer. After the Judicial Council issued its order affirming the reassignment, Judge McBryde—who had theretofore represented himself—retained legal counsel. Through counsel, Judge McBryde filed a petition in the Court of Appeals for the Fifth Circuit seeking a writ of mandamus ordering the Judicial Council and the Chief Judge of the Northern District of Texas to transfer *Satz* and *Torres* back to Judge McBryde's docket. During the course of the mandamus action, the Department of Justice provided counsel for the individual judges—other than Judge McBryde—and the Judicial Council retained private counsel. The Fifth Circuit issued the writ, holding that neither Chief Judge Buchmeyer nor the Judicial Council possessed the power to transfer cases from a district court judge due to dissatisfaction with the judge's handling of the cases. *In re McBryde*, 117 F.3d at 230–31. Judge McBryde subsequently defended against the Judicial Council's petition for rehearing en banc and petition for certiorari, both of which were denied.

Following the initial mandamus ruling by the Fifth Circuit, Judge McBryde requested reimbursement for his ongoing expenses stemming from the mandamus litigation from the Director of the Administrative Office of the U.S. Courts ("AO") pursuant to 28 U.S.C. § 463. The AO denied reimbursement because it viewed the mandamus action as offensive, rather than defensive, litigation, understanding section 463 to authorize reimbursement

only for the costs of defensive litigation. After twice requesting reconsideration of the decision, both of which requests were denied, Judge McBryde filed suit in the United States District Court for the District of Columbia, seeking a declaratory judgment that the AO must pay his expenses from the mandamus proceeding. *McBryde*, 50 Fed. Cl. at 263. At this point, the total amount sought by Judge McBryde was $103,922.19. The district court transferred the case to the Court of Federal Claims in March 2001.

Following the transfer, Judge McBryde filed an amended complaint seeking compensation for his mandamus expenses under the Tucker Act, by virtue of both 28 U.S.C. § 463 and the Compensation Clause of the United States Constitution. *Id.* The government moved to dismiss for failure to state a claim, and Judge McBryde moved for summary judgment on both of his theories of recovery. *Id.* The court held for Judge McBryde on the threshold issue of whether section 463 is money-mandating, but held for the government on the merits as to both the section 463 and Compensation Clause claims.[2] Judge McBryde now appeals. We exercise jurisdiction over an appeal from a final decision of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3).

II

We review the trial court's grant of summary judgment *de novo*, "determining whether the matter was amenable to summary resolution and, if so, whether the law was correctly applied to the undisputed facts." *Mass. Bay Transp. Auth. v. Unit-*

---

2. The court treated the government's motion as a motion for summary judgment as permitted by Rule of the Court of Federal Claims 12(b). *See* RCFC 12(b) ("If, on a motion asserting ... failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

ed States, 129 F.3d 1226, 1230–31 (Fed.Cir. 1997). As noted above, Judge McBryde seeks compensation based upon either section 463 or the Compensation Clause. We turn first to Judge McBryde's statutory claim.

A

Judge McBryde primarily bases his claim for relief on 28 U.S.C. § 463, which he argues mandates reimbursement in this case. Section 463 provides:

> Whenever a Chief Justice, justice, judge, officer, or employee of any United States court is sued in his official capacity, or is otherwise required to defend acts taken or omissions made in his official capacity, and the services of an attorney for the Government are not reasonably available pursuant to chapter 31 of this title, the Director of the Administrative Office of the United States Courts may pay the costs of his defense. The Director shall prescribe regulations for such payments subject to the approval of the Judicial Conference of the United States.

Initially, we must address whether section 463 can be the basis of a Tucker Act claim—a threshold issue raised by the United States both here and before the trial court. As the United States rightly notes, Tucker Act jurisdiction arises only when the underlying statute "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (quoting *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002 (1967)). If, as the United States urges, section 463 cannot fairly be interpreted as mandating compensation, then neither the trial court nor we may reach the merits of Judge McBryde's claim based on that statute.

The United States argues that the language "may pay" in section 463 indicates that the statute is not money-mandating, and therefore that it cannot support a claim under the Tucker Act. The government's argument is based largely on *Huston v. United States*, 956 F.2d 259, 262 (Fed.Cir.1992), in which we held that the Court of Federal Claims did not have jurisdiction over a claim for a pay increase under 5 U.S.C. § 5333(b). In *Huston*, the statute provided that "an employee ... who regularly has responsibility for supervision ... over employees whose pay is fixed and adjusted ... by wage boards ... as nearly as is consistent with the public interest in accordance with prevailing rates, *may* be paid at one of the rates for his grade which is above the highest rate of basic pay being paid to any such prevailing-rate employee regularly supervised...." 5 U.S.C. § 5333(b) (1988) (emphasis added). The court held that the statute did not mandate increased pay for supervisory employees, but rather granted complete discretion to the hiring agency to determine whether such pay increases should be granted. *Huston*, 956 F.2d at 261. The plaintiff in *Huston* admitted that the agency had great discretion, and we agreed, holding that the pay increase provision was wholly discretionary. We also noted that several other sections of the statute use the mandatory term "shall" when referring to pay rates, and remarked that the choice between "may" and "shall" within the same statute indicates a differentiation between mandatory and discretionary tasks. *Id.* at 262. *Huston* also recognized that where discretion is not unlimited, the statute can be money-mandating, citing *Bradley v. United States*, 870 F.2d 1578, 1580 (Fed.Cir.1989).

Other cases decided after *Huston*, however, have clarified that a money-mandating provision can use the term "may." In *Doe v. United States*, for example, we held

that the moiety statute, which authorizes the Secretary of the Treasury to compensate informants in customs investigations by giving them a portion of the recovery, is money-mandating, notwithstanding its use of the word "may." 100 F.3d 1576, 1582 (Fed.Cir.1996). The moiety statute set forth the statutory requirements for payment, and then provided that "the Secretary may award and pay such person an amount that does not exceed 25 percent of the net amount so recovered." 19 U.S.C. § 1619(a) (2000). We noted the force of the government's argument regarding the statute's use of the word "may," but explained that prior cases had interpreted the moiety statute as mandating some award, even though it gave the Secretary discretion to determine the amount. *Doe,* 100 F.3d at 1582. We also relied heavily on our understanding of the intent of Congress, which was not to vest complete discretion in the award of compensation. *Id.* We ultimately followed those earlier cases and held that despite the use of "may," the moiety statute was money-mandating.

The government concedes that the mere use of "may" in section 463 does not foreclose a finding that the section is nondiscretionary. Instead, the government notes that section 463 uses the term "may pay," whereas other provisions of Chapter 21 of Title 28 use the mandatory term "shall." *See, e.g.,* 28 U.S.C. § 456(a) (2000) (providing that the Director "shall pay each justice or judge of the United States ... while attending court or transacting official business at a place other than his official duty station" transportation expenses and subsistence expenses). Thus, the government argues that—as in *Huston*—in the context of Chapter 21 of Title 28, in which section 463 is codified, the "may" language clearly renders it discretionary.

■ We agree with the trial court that the conclusion to be reached from the

interplay of cases such as *Doe* and *Huston* is that the use of the word "may" does not, by itself, render a statute wholly discretionary, and thus not money-mandating. In reaching this conclusion, we have sound guidance from the Supreme Court. In *United States v. Rodgers,* 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983), the Supreme Court interpreted a statute in which Congress had replaced "shall" with "may," and stated the following guide for interpretation:

> The word "may," when used in a statute, usually implies some degree of discretion. This common-sense principle of statutory construction is by no means invariable, however, ... and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute....

*Id.* at 706, 103 S.Ct. 2132 (citations and footnotes omitted). We may thus presume that when Congress used the word "may" in the statute in suit, we should use common sense and presume that the word conveys some degree of discretion. But we must proceed to test that presumption against the intent of Congress and other inferences that we may rationally draw from the structure and purpose of the statute at hand.

■ As the trial court noted, the legislative history of section 463 indicates that Congress did not intend payment under the statute to be discretionary. Congress passed section 463 to correct a problem peculiar to judges and judicial branch employees. Normally, when an officer or employee of the United States is sued or subpoenaed in his or her official capacity, the Department of Justice (DOJ) provides representation for the affected party. *See* 28 U.S.C. § 516 (2000); *see also* 28 C.F.R. § 50.15(a) (2000). For members of the judicial branch, however, such representa-

tion can create an appearance of impropriety—and in some cases an outright conflict of interest—because DOJ attorneys regularly appear before the judges they may be called upon to represent. In recommending passage of section 463, the Senate Judiciary Committee Report explained that

> [u]sually, services are provided by U.S. Attorneys and their assistants, individuals who routinely represent the government in litigation before judges they are also required to represent. While many instances may arise in which no 'conflict of interest' or 'appearance of impropriety' exists, or is perceived to exist by the public, only a few such cases will be enough to permanently damage the legal system's reputation.

S. Rep. 97–275, 16, *reprinted in* 1982 U.S.C.C.A.N. 11, 26. To avoid the appearance of impropriety and the possibility that the judiciary might be diminished in the public's perception, Congress enacted section 463 to *"expressly authorize* the Director of the Administrative Office to 'pay the costs' when a judge or justice is sued in his official capacity and 'the services of an attorney for the government are not reasonably available pursuant to Chapter 31 (of Title 28)' [which provides for representation by the DOJ]." *Id.* at 15–16, 1982 U.S.C.C.A.N. at 25–26 (emphasis added). The purpose of this section, preservation of the integrity of the judiciary in the public eye, can be furthered only if private counsel is available to judicial officers whenever representation by the DOJ would cause an appearance of impropriety. Congress therefore clearly intended and "expressly authorize[d]" the Administrative Office to pay the costs whenever a judge sued in his or her official capacity is

forced to seek private counsel in lieu of a DOJ attorney. *Id.*[3]

Furthermore, like the only other Court of Appeals to examine this issue, we think that an interpretation of section 463 granting the AO discretion to pick and choose which judicial defendants should be compensated would raise serious constitutional questions. *See Tashima v. Admin. Office of the United States Courts,* 967 F.2d 1264, 1269–70 (9th Cir.1992). In *Tashima,* Judge Tashima, then a district court judge, was sued along with the other judges of the United States District Court for the Central District of California. The lawsuit challenged the validity of a local rule barring attorneys from appearing *pro hac vice* if they were either residents of California or regularly practiced in California. The DOJ appointed an attorney to represent the judges, and he defended the rule on a single ground: that it was constitutional. Judge Tashima, who had been among the dissenting voices in the decision to adopt the rule, wished to defend the rule's validity on grounds other than those espoused by the DOJ attorney. He therefore requested that he be allowed to hire private counsel, because his personal view of the case created a conflict with that of the United States. The AO turned him down, and he sued for a writ of mandamus and a declaratory judgment that he was entitled to private counsel at the AO's expense.

The district court granted Judge Tashima a declaratory judgment, and the Ninth Circuit affirmed. The court rejected as unreasonable, and very likely unconstitutional, the AO's position that it had discretion to deny reimbursement to Judge Tashima. The AO raised the identical argument in *Tashima* that the government

---

**3.** The statute, of course, also requires compensation if the judge is "otherwise required to defend acts taken or omissions made in his official capacity." 28 U.S.C. § 463 (2000).

We take up whether Judge McBryde's situation falls within the parameters of the "otherwise required to defend" prong *infra.*

presents to us here: "that Congress' use of the discretionary term 'may' rather than the mandatory term 'shall' indicates that Congress did not intend to impose any duty on the Administrative Office to pay for private counsel to represent judges sued in their official capacities when a government attorney is unavailable." *Id.* at 1268. However, if the statute truly vests discretion in the AO, a non-Article III entity,[4] to pick and choose which Article III judges to defend, then the statute may well raise serious constitutional concerns, because it would allow a non-Article III entity too much sway over the judiciary. *Id.* at 1269–70. As the Ninth Circuit explained, "[t]he discretion to pick and choose who will be represented at government expense and who will not would give the AO the power to influence or coerce a federal judge in the performance of the judge's official duties." *Id.* at 1270. The Ninth Circuit also noted that allowing the AO to make the policy decision regarding whether a particular representation would be in the best interests of the judiciary would itself raise serious constitutional questions. *Id.* "Judicial policymaking is a function traditionally assigned to the Judicial Conference and the Judicial Councils, Article III entities." *Id.* (footnote omitted). According to the government's theory, Congress shifted this particular policy decision from the Article III entities to their adjunct, the AO. Like the Ninth Circuit, we choose not

to believe that Congress could intend such a result because "[s]uch a reassignment of powers from Article III entities to a non-Article III adjunct is precisely the type of threat to the independence of the Judiciary which the Supreme Court has consistently invalidated." *Id.* (citing *N. Pipeline,* 458 U.S. at 84, 102 S.Ct. 2858). The AO "was created to perform, and historically has performed, a limited ministerial function. It was not intended to govern or make policy for the Judiciary." *Id.* at 1271. We agree with the Ninth Circuit that "[t]he AO's policy determinations in this case are by nature judicial business and outside the role of the Administrative Office." *Id.* As the Supreme Court stated in *Northern Pipeline,* "[t]he judicial power of the United States must be exercised by courts having the attributes prescribed in Article III [lifetime tenure and constitutionally-protected compensation.]" *Northern Pipeline,* 458 U.S. at 59, 102 S.Ct. 2858. Encroachment upon such judicial power by non-Article III entities necessarily raises a serious constitutional question.

We therefore agree with the trial court that, like the moiety statute, section 463 mandates payment when the statutory conditions are met, and it is therefore money-mandating for purposes of vesting the Court of Federal Claims with jurisdiction under the Tucker Act.

4. Although the AO works directly for the federal judiciary, it is no more an Article III entity than a U.S. Bankruptcy Court, *see N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598, or other administrative agencies that serve Article III interests, *see Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). *See also Chandler v. Judicial Council of the Tenth Circuit,* 398 U.S. 74, 97, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970) (Harlan, J., concurring) ("The role of the Administrative Office, and its Director, was to be 'administrative' in

the narrowest sense of that term. The Director was entrusted with no authority over the performance of judicial business—his role with respect to such business was, and is, merely to collect information for use by the courts themselves."). Thus, while Congress may create non-Article III entities such as the AO to assist the Article III judiciary, the constitution frowns upon excess delegation of authority over Article III bodies to such non-Article III entities. *See N. Pipeline,* 458 U.S. at 84, 102 S.Ct. 2858.

## B

Having concluded that the trial court correctly asserted jurisdiction over this case, we turn to whether section 463 authorizes payment of Judge McBryde's legal expenses flowing from the mandamus action. As we noted above, the statute authorizes payment in two situations: (1) when a judge is sued in his official capacity; and (2) when a judge is required to defend acts taken or omissions made within the scope of his official capacity. Judge McBryde argues that he is entitled to compensation under either or both prongs of the section 463 inquiry. We disagree.

■ First, Judge McBryde was not named as a defendant in a lawsuit in his official capacity, and the statute therefore does not mandate compensation for his expenses under the "sued in his official capacity" prong. It is beyond cavil that Judge McBryde was not named as a defendant in a suit filed in a court. Nevertheless, Judge McBryde argues that the proceedings in the Judicial Council were in the nature of a suit against him, and the mandamus proceeding—which he concedes, as he must, that he initiated—was in the nature of an appeal from the adverse decision of the Judicial Council. There are two problems with this theory of recovery. First, Judge McBryde initiated the proceedings in the Judicial Council when he filed a request for assistance with that body. Thus, even assuming that the proceedings in the Judicial Council were in the nature of a lawsuit, Judge McBryde stood in the position of a plaintiff with respect to those proceedings, for it was his complaint to the Council that initiated them. As the plain meaning of "is sued in his official capacity" unambiguously refers to defensive, rather than offensive, litiga-

tion, that prong does not provide for compensation when, as here, the judge is in the position of a plaintiff initiating offensive litigation.

Second, the proceeding before the Judicial Council was not a lawsuit; it was an internal investigation proceeding under the Judicial Conduct and Disability Act, 28 U.S.C. § 372 (the "Act").[5] As the District of Columbia Circuit has explained, "Congress sought in the Act to give the judiciary the power to 'keep its own house in order' by conducting its own investigations of misconduct." *McBryde,* 264 F.3d at 61 (citing S.Rep. No. 96–362, at 11, *reprinted in* 1980 U.S.C.A.A.N. at 4325). The Act therefore provides for private, internal policing of the judicial branch by the judicial branch. Courts do not have jurisdiction to hear appeals from the merits of section 372 determinations because the Act specifically provides that such review can be had only by petition to the Judicial Conference of the United States. 28 U.S.C. § 372(c)(10) (2000) (providing that a judicial officer "aggrieved by an action of the judicial council under paragraph (6) of this subsection may petition the Judicial Conference of the United States for review thereof"). Judicial review of the Judicial Conference's determinations is similarly precluded: "all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." *Id.* Thus, there could be no "appeal" to the Fifth Circuit from the decision of the Judicial Council. Rather, in *In re McBryde,* the Fifth Circuit reviewed and remedied by mandamus the decision of Judge Buchmeyer (rather than the Judicial Council) to transfer *Satz* and *Torres*

---

**5.** Judge McBryde's assertion that the Fifth Circuit held that the proceedings before the Judicial Council were judicial in nature is incorrect. The other two judges on the panel did not join the portion of Judge Higginbotham's opinion discussing that issue. *See In re McBryde,* 117 F.3d at 231.

from Judge McBryde's docket. *See In re McBryde*, 117 F.3d at 221.

■ But even assuming *arguendo* that the mandamus action was, in some way, an appeal from the section 372 action, section 463 does not provide the appropriate avenue to obtain reimbursement. In addition to providing for internal disciplinary proceedings and internal (*i.e.*, extrajudicial) review of section 372 proceedings, Congress also explicitly provided a mechanism by which a judge subjected to a section 372 proceeding can be compensated for expenses resulting from such an investigation:

> Upon the request of a judge or magistrate judge whose conduct is the subject of a complaint under this subsection, the judicial council may, if the complaint has been finally dismissed under paragraph (6)(C) [*i.e.*, dismissal in the judge's favor], recommend that the Director of the Administrative Office of the United States Courts award reimbursement, from funds appropriated to the Federal judiciary, for those reasonable expenses, including attorneys' fees, incurred by that judge or magistrate judge during the investigation which would not have been incurred but for the requirements of this subsection.

28 U.S.C. § 372(c)(16) (2000). Thus, Congress specifically spoke to situations in which a judge incurs litigation expenses in the course of a section 372 investigation, and decided that only judges who actually win can be reimbursed, and then only upon the recommendation of the Judicial Conference. Thus, assuming *arguendo* that Judge McBryde's mandamus action was an appeal from the section 372 investigation of the Judicial Council, his remedy is not to seek compensation under section 463, but rather to pursue reimbursement at the recommendation of the Judicial Conference under section 372(c)(16).

■ Judge McBryde also argues that resort to the mandamus action was required to defend his judicial acts in *Satz* and, *Torres*, and that the "otherwise required to defend" prong of section 463 therefore authorizes reimbursement of his expenses. In Judge McBryde's view, the transfers by Judge Buchmeyer and the Judicial Council were responses to or sanctions for his judicial acts in *Satz* and *Torres*, and therefore he was required to file the mandamus action in order to "remediat[e] the effect of those orders on Judge McBryde and his judicial business." He also contends that "[t]he institution and pursuit ... of the mandamus proceeding were essential to the preservation of his individual judicial independence and the concept of judicial independence." For its part, the government argues that no one forced Judge McBryde to take a writ to the Fifth Circuit, so he was not "otherwise *required* to defend" his actions.

The trial court thought that the "otherwise required to defend" prong of section 463 covers circumstances in which a judge is compelled to defend the judge's acts despite not having been sued. "Examples of such instances may include defending a judicial employee subpoenaed in his official capacity as a witness before Congress, an administrative body, a court, or a grand jury." *McBryde*, 50 Fed. Cl. at 267. Although the court acknowledged that a petition for mandamus might sometimes fall within the scope of section 463, the court held that "[t]he phrase does not apply to a case of this nature where one judge sues another judge and the Judicial Council to challenge orders transferring cases from his docket." *Id.*

We agree with the trial court, and hold that the correct interpretation of "otherwise required to defend" refers to situations in which a judge takes action to defend against coercive government acts.

Compensable actions would include (though not be limited to) bringing a petition to quash a subpoena because subpoenas are backed by the coercive (*i.e.,* the contempt) power of the government. The legislative history of section 463, while sparse, supports this interpretation of the statute. As we noted above, the committee report that accompanied section 463 to the floor of the Senate indicated that Congress's overarching concern was to provide representation for judges who, though named in their official capacity, cannot be represented by the DOJ because of ethical concerns. The most obvious example, and the one specifically mentioned in the statute, is when a judge is a named defendant in a lawsuit. However, a judge is equally named in his official capacity when served with a subpoena, for instance, even if the judge is not in fact a defendant in the underlying lawsuit. And, because subpoenas are backed by the coercive power of the government, a judge named in a subpoena is, in fact, *required* to defend himself when he is subpoenaed on a matter related to his official acts.

Under the foregoing interpretation of the "otherwise required to defend" prong, section 463 does not provide compensation to Judge McBryde on the facts of this case. This is so because he was not required by government compulsion to defend his acts in *Satz* and *Torres*. We accept that Judge McBryde felt compelled, in that he felt an internal duty, to take action to preserve these cases upon his docket. However, in seeking to vindicate his right to retain *Satz* and *Torres*, Judge

McBryde was no more "required to defend" his acts than is any other plaintiff who enters a court seeking to vindicate an interest protected by common law, statute or constitution. In truth, Judge McBryde initiated this action because he wished to do so, not because he had to do so.[6] That in so doing he may have helped advance the cause of judicial independence is admirable, but the importance of the interests he sought to protect does not convert his choice to engage in offensive litigation into a defensive act under section 463.

Like the trial court, we do not hold that a petition for a writ of mandamus will always fall outside the boundaries of section 463. We simply hold that under the circumstances of this case, in which Judge McBryde was not the subject of any government compulsion that required him to defend his acts by seeking a writ or, indeed, by petitioning the Judicial Council for relief from Judge Buchmeyer's transfer orders, section 463 does not allow for reimbursement.

C

We turn next to Judge McBryde's claim that the Compensation Clause of the U.S. Constitution entitles him to reimbursement of his legal expenses in the mandamus action. The Compensation Clause provides that "[t]he Judges, both of the supreme and inferior Courts, shall ... at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const., art. III, § 1. As Judge

6. It is true that Chief Judge Buchmeyer's orders transferring *Satz* and *Torres* from Judge McBryde's docket were coercive government acts. However, it is important to remember that—however Judge McBryde may have perceived them—the orders exerted compulsion upon the *parties* in *Satz* and *Torres* and not upon the judges involved in adjudicating those matters because it compelled the parties to litigate in front of Judge Buchmeyer rather than Judge McBryde. The orders also exerted compulsion upon the clerk of court, because the clerk was ordered not to enter into the official record any further orders issued by Judge McBryde in those cases. The orders, however, were not directed towards Judge McBryde and did not compel any alteration in his behavior.

McBryde correctly notes, we have held that the Compensation Clause, "fairly interpreted, mandates the payment of money in the event of a prohibited compensation diminution" and therefore gives rise to Tucker Act jurisdiction. *Hatter v. United States,* 953 F.2d 626, 628 (Fed.Cir.1992).

■ The Compensation Clause protects sitting judges both from direct reductions in their salary, and from some indirect reductions. *See United States v. Hatter,* 532 U.S. 557, 569, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001) ("[T]he Compensation Clause offers protections that extend beyond a legislative effort directly to diminish a judge's pay, say, by ordering a lower salary. Otherwise a legislature could circumvent even the most basic Compensation Clause protection by enacting a discriminatory tax law, for example, that precisely but indirectly achieved the forbidden effect" (internal citation omitted).). With respect to indirect reductions in compensation, the Supreme Court has made it clear that it is those laws that specifically target the judiciary, *i.e.,* discriminatory laws, that may violate the Compensation Clause. *Id.* at 572, 121 S.Ct. 1782. In *Hatter,* the Court held that application of the Medicare tax to judges appointed before its enactment did not violate the Compensation Clause. *Id.* That tax affected all citizens equally; unlike the Social Security tax that the Court invalidated in *Hatter,* the Medicare tax did not single out members of the judicial branch. The *Hatter* Court adopted the reasoning of Justice Holmes's and Justice Brandeis's dissent in *Evans v. Gore,* 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920), that "the Compensation Clause offers 'no reason for exonerating' a judge 'from the ordinary duties of a citizen, which he shares with all others. To require a man to pay the taxes that all other men have to pay cannot possibly be made an instrument to attack his independence as a judge.'" *Hatter,* 532 U.S. at

570, 121 S.Ct. 1782 (quoting *Evans,* 253 U.S. at 265, 40 S.Ct. 550 (Holmes, J., dissenting)).

■ Judge McBryde argues that he would not have incurred the litigation expenses were he not a judge, and that therefore "[t]he denial of reimbursement [of his legal expenses] is tantamount to an indirect reduction in his income." We disagree. First, as we discussed above, Judge McBryde initiated the litigation for which he seeks compensation of his own accord—he was under no affirmative duty to file his request for assistance with the Judicial Council or his petition for a writ of mandamus. That he chose to do so in order to vindicate his legal interests does not differentiate him from any other plaintiff. And, for the bulk of the citizenry at least, it is well understood that plaintiffs engage in civil litigation at their own expense—not at the government's expense. That Judge McBryde should suffer this burden with the rest of his fellow citizens does not violate the Compensation Clause because paying litigation expenses is simply another example of a general burden that judges share with all other citizens. Indeed, it is hard to see how the government could possibly single out Judge McBryde—or any judge—for negative treatment based on litigation that the judge freely chooses to initiate. The government did not impose a duty on judges to pursue this sort of litigation, and thus it cannot exert any influence on whether judges choose to reduce their available pool of monetary reserves through engaging in it.

Second, litigation expenses—like most expenses of life—do not reduce compensation. As alluded to above, expenses simply claim a portion of the judge's compensation *after* it has been paid. And, while the Court in *Hatter* did find that a tax, which is one sort of expense, of course,

could violate the Compensation Clause if it discriminated against judges, it is important to note that a tax is an expense imposed by and paid to the government. The government has control over the amount of the tax, and indeed the tax is simply deducted from gross pay before the paycheck ever reaches the individual judge. A tax therefore provides a uniquely dangerous opportunity for the government to target the judiciary for an indirect decrease in take-home salary by an amount that flows immediately back into the government treasury. Such a discriminatory tax, and the opportunity it provides for the government to exert undue influence over an independent judiciary, is precisely the sort of danger that the Compensation Clause guards against. Here, however, we can see no such danger. The government did not mandate that Judge McBryde incur these litigation costs, nor did it reap the benefit of the imposition of those costs—Judge McBryde's lawyers did. Therefore, there is simply no danger that the government could somehow influence or intimidate Judge McBryde or other judges similarly situated by refusing to pay legal expenses incurred through the judge's decision to pursue offensive litigation to vindicate his own legal rights. Thus, failure to compensate Judge McBryde for the expenses he incurred in pursuing the mandamus action does not diminish his salary in violation of the Compensation Clause.

## III

For the reasons given above, we conclude that while section 463 is money mandating for purposes of creating Tucker Act jurisdiction, the undisputed facts of this case do not entitle Judge McBryde to recover the costs of pursuing his mandamus action under either prong of section 463. Furthermore, the failure to pay such expenses does not violate the Compensation Clause of the U.S. Constitution. There-

fore, we affirm the judgment of the Court of Federal Claims in its entirety.

### COSTS

No costs.

*AFFIRMED.*

Opinion for the court filed by Circuit Judge CLEVENGER. Dissenting opinion filed by Circuit Judge NEWMAN.

PAULINE NEWMAN, Circuit Judge, dissenting.

Judge McBryde acted with courage and pertinacity in defending his judicial authority against the actions of assorted lawyers, bureaucrats, and colleagues. He succeeded, fully and unequivocally. The Fifth Circuit Court of Appeals vindicated his position, and returned his cases to his docket. *In re McBryde*, 117 F.3d 208 (5th Cir. 1997). My colleagues on this panel hold that because the defense of his official acts required Judge McBryde to seek a writ of mandamus, he was therefore not a "defender" of judicial authority, but simply a "plaintiff initiating offensive litigation." On this ground the court holds that Judge McBryde is not entitled to the benefit of the statute whereby judges are recompensed for the attorney fees incurred in defense of actions taken in their official capacity.

The stakes for the nation are high. When a judge's cases are transferred in order to change the result, such actions threaten the public's right to an independent judiciary. *See Stump v. Sparkman*, 435 U.S. 349, 355, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978):

As early as 1872, the Court recognized that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own

convictions, without apprehension of personal consequences to himself."
(quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1871)).

The attorney services statute, 28 U.S.C. § 463,[1] is based on the premise that judicial acts must be free of intimidation and that the defense of judicial acts should not be at the personal expense of the judge. We are not here called upon to decide how far a district or circuit court can go in overseeing the way a judge performs his duties, for the Fifth Circuit decided that issue in favor of Judge McBryde. The only question before us is the statutory entitlement to reimbursement of attorney fees.

### The Judicial Acts

The incidents that triggered these events are not irrelevant to this review, for they make clear that Judge McBryde had "taken acts in his official capacity," 28 U.S.C. § 463, and that he became obliged to defend these acts. In two cases, that of *Torres* and of *Satz*, the chief judge of the district court transferred the pending cases from Judge McBryde's docket to his own, and withdrew orders that Judge McBryde had issued and substituted his own, thereby changing substantive rulings.

In the *Torres* case, the court clerk discovered that the clerk's office, through inadvertence, had not followed Judge McBryde's order four years earlier that the sum of $40,000 awarded to a minor named Grecia Torres should be placed in an interest-bearing account. On discovering the error the clerk contacted the Administrative Office of the United States Courts, and received the advice that the minor should file a claim under the Federal Tort Claims Act. Judge McBryde rejected this remedy, and issued an Order that stated:

> The court is disappointed that there would even be a suggestion that Grecia Torres, a minor, acting through a person or persons who might legally be qualified to act on her behalf, would be required to go to the time and expense to exhaust administrative remedies, through a tort claims process, before being able to obtain relief from violation of an order of this court....

The clerk, upon consultation with Chief Judge Buchmeyer, responded in a manner that Judge McBryde deemed "disrespectful" and "insolent." Judge McBryde insisted that action under the Tort Claims Act was an inappropriate remedy for the court's error, whereupon the Chief Judge removed the case from Judge McBryde, reassigned it to himself, vacated Judge McBryde's orders, and sealed the file.[2] Chief Judge Buchmeyer filed a memorandum stating that the reassignment was necessary "to avoid public humiliation and damage to the District Clerk, as well as to the reputation of this Court."

The second case involved the criminal trial of a defendant named Satz. After jury trial and conviction of Satz, Judge McBryde denied the government's request to delay sentencing until after sentencing of Satz on a similar conviction in Arizona. The issues were complex,[3] and after various hearings Judge McBryde held an As-

---

**1.** 28 U.S.C. § 463. Whenever a Chief Justice, justice, judge, officer, or employee of any United States court is sued in his official capacity, or is otherwise required to defend acts taken or omissions made in his official capacity, and the services of an attorney for the Government are not reasonably available pursuant to chapter 31 of this title, the Director of the Administrative Office of the Unit- ed States Courts may pay the costs of his defense.

**2.** The facts are more fully set forth in the opinion of the Fifth Circuit, *In re McBryde*, 117 F.3d 208 (5th Cir.1997).

**3.** *See* n. 2 *supra*.

sistant United States Attorney in contempt for failing to comply with an order of the court and refusing to answer questions about the Arizona proceeding, Judge McBryde stating that the AUSA "engaged in falsehood and deception." The AUSA complained to Chief Judge Buchmeyer, who vacated Judge McBryde's contempt order and reassigned the case to himself. Judge McBryde objected, and attempted to enter the judgment and sentence. Chief Judge Buchmeyer then directed the clerk to file only materials signed by himself; he declared Judge McBryde's orders void, and sealed the file. Judge Buchmeyer issued an order that described the accused AUSA as "entirely truthful," and quoted the Arizona U.S. Attorney as stating that Judge McBryde's action in unsealing the file jeopardized an Arizona grand jury investigation.[4]

Judge McBryde filed a "Request for Assistance in Resolution of Dispute" with the Fifth Circuit Judicial Council. Circuit Chief Judge Politz referred the matter to a Special Investigatory Committee. The Committee heard testimony from Judge McBryde, but refused his request to be present during the testimony of the other witnesses, Chief Judge Buchmeyer and the clerk and AUSA who had been criticized. The Judicial Council adopted the Committee's recommendations, ruling that Judge McBryde's accusations "threaten[ed] irreparable damage to the professional reputations and career of" the clerk and the AUSA, and criticized other actions in these cases as "an impediment to the effective administration of justice."[5]

Judge McBryde appealed to the Court of Appeals for the Fifth Circuit, his appeal taking the form of a petition for a writ of mandamus for the return of these two cases to his docket. The Department of Justice provided counsel to Chief Judge Buchmeyer, the clerk, and the AUSA; the Judicial Council retained private counsel; and Judge McBryde retained private counsel. Following a hearing, the Fifth Circuit issued the writ of mandamus in favor of Judge McBryde. The court observed that "reassignment of cases in response to disagreement with substantive rulings pertaining to those cases threatens the very structure of the federal court system." *McBryde,* 117 F.3d at 223.

The Fifth Circuit observed that the circuit's Judicial Council is not an appellate court, and "Chief Judge Buchmeyer as a district judge lacks the power of appellate review over his fellow district court judges." *Id.* The Fifth Circuit decision is not subject to collateral review; nor is it subject to administrative interpretation in application of 28 U.S.C. § 463. However, when Judge McBryde requested reimbursement of his attorney fees from the Administrative Office, as the statute provides, the General Counsel and Associate Director issued a "decision" denying reimbursement, ruling that the mandamus action was offensive rather than defensive.

---

4. The Fifth Circuit found this "curious," since earlier disclosures of the same information were not made under seal:

   Curiously, this effect of Judge McBryde's order [alerting targets of the investigation] is asserted in spite of disclosures made by AUSA Umphres' first motion for a continuance, filed on April 4 not under seal and presumably served on Satz's attorney....

   *In re McBryde,* 117 F.3d at 216.

5. The majority opinion at its footnote 1 suggests that there were a "plethora" of "charges" against Judge McBryde. That is incorrect; the only issues related to these phases of the *Torres* and *Satz* cases. These charges did not concern "conduct on the bench," as the panel majority states, but substantive acts taken in the judge's official capacity.

## I

I do not speculate whether any of the participants in these events might have acted more temperately, mindful of "the egos that sometimes flourish under the shelter of Article III," as the Fifth Circuit put it. The only question is whether Judge McBryde, who did not receive assistance of counsel from the Department of Justice under § 463, is entitled to reimbursement of his attorney fees under § 463.

The panel majority holds that Judge McBryde was neither "sued in his official capacity" nor "required to defend acts taken or omissions made in his official capacity." The majority's theory is that because Judge McBryde's defense of his official acts took the form of petitioning for a writ of mandamus, he was not a defender but a "plaintiff." However, the mandamus proceeding was solely in defense of Judge McBryde's judicial actions and authority. A judge need not be subpoenaed, as the majority argues, in order to be in the position of defending "acts taken in his official capacity," in the words of § 463.

The panel majority proposes that Judge McBryde could have simply acquiesced in this assault on his judicial authority, and thus have avoided the legal cost of defending his official acts. My colleagues read the words "otherwise required to defend" in § 463 to mean that the statute excludes legal services in any situation where such acquiescence is possible. I suppose a person can always choose not to defend oneself against attack. However, when the attack strikes at the independence and convictions of the judge, relief from the financial cost of that defense is provided by § 463. As reiterated in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 60, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982):

> [O]ur Constitution unambiguously enunciates a fundamental principle—that the "judicial Power of the United States" must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence.

An independent judiciary requires independence not only from the other branches of the government, but from pressures and influences of persons within the judicial institution, including the reassignment of cases in order to change their disposition.

Judicial independence and judicial integrity are inseparable. It is not Judge McBryde's personal rights that are at issue; it is the nation's right that judges be free of attempted dominance or pressure, that they conduct their judicial business in accordance with their conscience, and stand up for their convictions. Justice Charles Evans Hughes referred to the judge's "bedrock of conviction" as the foundation strength of the nation's system of justice. *See The Supreme Court of the United States* 49 (1928).

With finality of the Fifth Circuit's decision, Judge McBryde's entitlement to reimbursement of attorney fees under § 463 was established. This entitlement vested with the decision of the Fifth Circuit; there is no discretion in the Administrative Office to withhold reimbursement. Neither the Court of Federal Claims nor the Federal Circuit nor the Administrative Office has authority to re-characterize the proceedings in the Fifth Circuit. My colleagues on this panel appropriately point out that the Administrative Office was not created under Article III, and does not exercise policy authority over Article III judges. (Of course, neither was the Court of Federal Claims, to whom my colleagues consign this policy authority, created under Article III.) Section 463 is a fee-shifting statute, not a new cause of action. Whether the statutory conditions of § 463

are met is the business and authority of the Fifth Circuit; and when the circuit court resolved Judge McBryde's defense of his official acts, reimbursement under § 463 is entirely ministerial. Indeed, congressional intent that this reimbursement be ministerial, and not subject to collateral review under the Tucker Act, is apparent in the structure of § 463, which directly authorizes the Administrative Office to dispense these funds. My colleagues err in holding that the Tucker Act applies and that the Court of Federal Claims (and the Federal Circuit on appeal) have authority and obligation to review the Fifth Circuit proceedings in order to decide entitlement to attorney fees.

## II

Judge Cranch wrote that it "becomes the duty of the Judiciary calmly to poise the scales of justice, unmoved by the armed power, undisturbed by the clamor of the multitude," *United States v. Bollman*, 24 F. Cas. 1189 (C.C.D.C.1807) (No. 14,622). Judge McBryde's positioning of the scales of justice was at a cost of $103,922.19. From my colleagues' decision that these fees are not reimbursable under § 463, and from the procedure whereby reimbursement under § 463 requires satellite litigation in the Court of Federal Claims and potential appeal to the Federal Circuit, I respectfully dissent.