# In the United States Court of Federal Claims

No. 12-481

(Filed July 17, 2013)

************************************

|  |  |  |
|---|---|---|
| | * | |
| **MATTHEW WALTER STEPHAN,** | * | Overseas Differentials and |
| | * | Allowances Act of 1960, 5 U.S.C. § |
| Plaintiff, | * | 5921 *et seq.*; Living Quarters |
| | * | Allowance; Department of State |
| v. | * | Standardized Regulations; Civilian |
| | * | Personnel Management Instruction; |
| **THE UNITED STATES,** | * | RCFC 12(b)(1); subject matter |
| | * | jurisdiction. |
| Defendant. | * | |
| | * | |

************************************

## OPINION AND ORDER

Plaintiff, Matthew Stephan ("Stephan"), *pro se*, brings this action alleging that he is entitled to a Living Quarter Allowance ("LQA"), pursuant to 5 U.S.C. § 5923. The case is now before the Court on the United States' (the "Government") motion to dismiss for lack of subject matter jurisdiction. The Government questions whether the statute or its implementing regulations are money-mandating. The Court concludes that jurisdiction is proper, such that the Government's motion to dismiss is DENIED.

## I. Background

### a. Legal Framework

The Overseas Differentials and Allowances Act of 1960 ("ODAA") establishes, *inter alia*, the statutory authority for Federal agencies to provide LQAs to employees serving overseas. *See* 5 U.S.C. § 5921 *et seq.* The ODAA states in relevant part:

> (a) When Government owned or rented quarters are not provided without charge for an employee in a foreign area, one or more of the following allowances *may be granted when applicable*:
> (1) A temporary subsistence allowance…
> (2) A *living quarters allowance* for rent, heat, light, fuel, gas, electricity, and water…
> (3) Under unusual circumstances, payment or reimbursement for extraordinary, necessary, and reasonable expenses.

5. U.S.C. §5923(a) (emphasis added).

1

Section 5922 ("General Provisions") likewise states that such allowances "*may be granted* to an employee officially stationed in a foreign area." 5 U.S.C. §5922(a) (emphasis added). These allowances, however, "*shall* be paid under regulations prescribed by the President." § 5922(c) (emphasis added). The ODAA also authorizes the President to promulgate regulations governing "(1) payments of the allowance and differentials and the respective rates at which the payments are made; (2) the foreign areas, the groups of positions, and the categories of employees to which the rates apply; and (3) other related matters." *Id.* The President, in turn, has delegated his authority to the Secretary of State. Exec. Order 10903, 26 Fed. Reg. 217 (Jan. 9, 1961).

Pursuant to the President's delegation, the Secretary of State promulgated the Department of State Standardized Regulations ("DSSR"). Mirroring the language of the statute, the DSSR provides that the "[q]uarters allowances … *may be granted* to employees recruited outside the United States" if those employees meet certain conditions. DSSR § 031.12 (emphasis added). As applied to Stephan, the DSSR requires that "prior to employment, the employee was recruited in the United States … by the United States Government, including its Armed Forces; a United States firm, organization, or interest … and had been in substantially continuous employment by such employer under conditions which provided for his/her return transportation to the United States[.]" *Id.* at § 031.12(b). The DSSR also grants limited authority to agencies to develop their own regulatory scheme. *Id.* at § 013.

Pursuant to this second level delegation of authority, the Secretary of Defense issued Volume 1250 of the Civilian Personnel Management Instruction ("CPMI"). The CPMI states that "[a]ll of the allowances authorized by [the DSSR] *may be authorized* for DoD civilian employees living in foreign areas[.]" CPMI § 4(b) (emphasis added). The CPMI also states that "[o]verseas allowances and differentials are not automatic salary supplements, nor are they entitlements." *Id.* at § 4(c).

### b. The Complaint[1]

Stephan was recruited from his Maryland home by Computer Sciences Corporation ("CSC"), a U.S. firm. On July 23, 2008, CSC extended an offer of employment to Stephan. Stephan accepted CSC's offer for the full time position of Information Security Engineer Senior Professional. This position was intended to support a CDC contract with the U.S. Navy in Yokosuka, Japan under the US-Japan Status of Forces Agreement ("SOFA").

Stephan received an offer letter from CSC, but claims that the offer letter did not touch on all of the benefits that he was to receive. Stephan claims that he was entitled to transportation to and from Japan, LQA payments, cost of living allowance, full base

---

[1] The facts are derived from the allegations in Stephan's Complaint. This recitation is provided only to give context to the issue before the Court, which is purely legal.

Commissary and Exchange privileges, and full military postal service privileges for the duration of his employment with CSC.

In late 2009, Stephan learned that the Navy had decided to cut his position from CSC's 2010 contract extension. Instead, the Navy intended to hire a civil servant to perform those duties. This position was advertized under identification number P3S0095-798981. The Complaint states that the advertisement for the P3S0095-798981 position indicated that the job included LQA for eligible personnel. Compl. at ¶¶ 10-11.

Stephan responded to the advertisement. He was given a tentative job offer, at which time the human resources office requested that he fill out paperwork in order to determine his eligibility for an LQA. Stephan alleges that he was twice told that he was approved for an LQA. Compl. at ¶ 13. On March 11, 2010, Stephan was shown an email that indicated that he was determined eligible for an LQA. A copy of this email was forwarded to him afterwards.

It was at this time—March of 2010—that CSC approached Stephan and asked him to make a determination to either continue employment with CSC in a new role or to begin the separation process. Based on his conversations with the Navy's human resources people, Stephan informed CSC that he would begin his employment with the Navy on March 29, 2010.

After he began the separation process with CSC, Stephan was informed that he had been found ineligible for the LQA. He was also told that his commanding officer at his office, Naval Computer & Telecommunications Station Far East ("NCTS-FE"), has requested a waiver in order to grant Stephan an LQA. On September 13, 2010, Stephan submitted an LQA re-review request and, in case he was still found ineligible, a waiver request. He was informed that the denial of his LQA waiver was final.

On June 23, 2011, Stephan received a copy of the LQA waiver request and rejection letters from NCTS-FE. Upon review, he noted that his name was not among those listed for waiver requests. Finally, on August 10, 2011, a final letter issued denying Stephan's LQA status.

Stephan pursued additional administrative routes in an effort to have his LQA status changed. The Office of Personnel Management ("OPM") stored his case under OPM File Number 11-0027. This file stated that Stephan met all but one of the requirements set forth under DSSR § 031.12(b), which speaks to the qualifications for LQA. That exception was the provision of return transportation to the United States by CSC.[2]

## II.    Legal Standard

---

[2] This particular issue is the key to the merits portion of this case, but is largely irrelevant to the instant motion to dismiss.

### a. *Pro Se* Pleadings

A *pro se* plaintiff's pleadings are generally held to "less stringent standards" than those of a professional lawyer. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (requiring that allegations contained in a *pro se* complaint be held to "less stringent standards than formal pleadings drafted by lawyers"); *Forshey v. Principi*, 284 F.3d 1335, 1357 (Fed. Cir. 2002) (*en banc*) ("[T]he pleadings of *pro se* litigants should be held to a lesser standard than those drafted by professional lawyers . . . ."), *superseded by statute on other grounds as stated in Morgan v. Principi*, 327 F.3d 1357, 1359-60 (Fed. Cir. 2003).

However, "[w]hile a court should be receptive to *pro se* plaintiffs and assist them, justice is ill-served when a jurist crosses the line from finder of fact to advocate." *Demes v. United States*, 52 Fed. Cl. 365, 369 (2002). Moreover, "the leniency afforded to a *pro se* litigant with respect to mere formalities does not relieve the burden to meet jurisdictional requirements." *Minehan v. United States*, 75 Fed. Cl. 249, 253 (2007) (citing *Kelley v. Sec'y, U.S. Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987)).

### b. Rule 12(b)(1)

A motion brought pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") challenges the Court's subject matter jurisdiction. When faced with a motion to dismiss for lack of subject matter jurisdiction, a court must assume that all undisputed facts alleged in the complaint are true, and it must draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

## III.    Discussion

Pursuant to the Tucker Act, 28 U.S.C. § 1491, this Court maintains jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. §1491(a)(1). The Tucker Act itself does not create a substantive cause of action, which means that "a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc* in part). "In the parlance of Tucker Act cases, that source must be 'money-mandating.'" *Id.* (citations omitted).

The Supreme Court has recently emphasized that a statute or regulation is "money-mandating" if "it can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (internal quotation omitted). The Court went on to explain that:

> This "fair interpretation" rule demands a showing *demonstrably lower* than the standard for the initial waiver of sovereign immunity. "Because

the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity." It is enough, then, that a statute creating a Tucker Act right be *reasonably amenable* to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," a fair inference will do.

*White Mountain*, 537 U.S at 472-73 (internal citations omitted, emphasis added). On the other hand, "[a] statute is not money-mandating when it gives the government complete discretion over the decision whether or not to pay an individual." *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006). If the statute is not money mandating, the Court must dismiss the case for lack of jurisdiction. *Fisher*, 402 F.3d at 1173.

The statute, DSSR and CPMI all use the word "may" in defining eligibility for an LQA. *See* 5 U.S.C. § 5923(a) ("may be granted"); DSSR § 031.12 "may be granted"); CPMI § 4(b) ("may be authorized"). The word "may" often carries with it an implication of discretion. *See United States v. Rogers*, 461 U.S. 677, 706 (1983) (The "word 'may,' when used in a statute, usually implies some degree of discretion."); *McBryde v. United States*, 299 F.3d 1357, 1362 (Fed. Cir. 2002) (When the word "may" is used in a statute, "we should use common sense and presume that the word conveys some degree of discretion."). Although the use of the word "may" creates a presumption of discretion, the Federal Circuit has recognized that some statutes may still be money-mandating, even when they contain discretionary language. A statute is money-mandating, despite the use of discretionary language, in three situations: "(1) the statute has clear standards for paying money to recipients, (2) the statute specifies precise amounts to be paid, or (3) the statute compels payment once certain conditions are met." *Doe*, 463 F.3d at 1324.

The Government's motion is premised on the theory that § 5923 and its implementing regulations are money-authorizing, not money-mandating. Its theory is based in the language of the statute and regulations, each of which contains discretionary terminology. Meanwhile, Stephan accepts that language but argues that the statutes and regulations make the LQA mandatory. The Court agrees with Stephan and therefore concludes that jurisdiction is proper here.

This case does not come before the Court in a vacuum. A number of cases have already touched on this issue, but the results have been very inconsistent. A brief review of some of these cases is useful.

The starting-off point of this analysis must necessarily be *Trifunovich v. United States*, 196 Ct. Cl. 301 (1971), which, as a decision of the Court of Claims, is binding on this Court. As a general proposition, the legal question in *Trifunovich* was whether the plaintiff there satisfied the substantive requirements of the ODAA and DSSR § 031.12d such that he qualified for LQA. Although that specific provision no longer exists in the current version of the DSSR, the operative language remains the same: "Quarters

5

allowances … may be granted to employees recruited outside the United States, provided that" certain conditions are met. *See* DSSR § 031.12; *Trifunovich*, 196 Ct. Cl. at 305.

As an initial matter, the Court agrees with the Government's assertion that *Trifunovich v. United States*, 196 Ct. Cl. 301 (1971), did not directly decide the instant issue. There was, as the Government argues, no express finding that either the ODAA or the DSSR provided a basis for jurisdiction. *See* Gov't Mot. at 16. But the court examined the language of the statute and regulations and concluded—despite the presence of some permissive language—that the plaintiff's claim rested on deprivation of statutory and regulatory rights and did not involve an inquiry into whether the Navy Department had abused its discretion. In other words, the Navy Department was *bound* to follow the language of the statute and regulations. If the Government is bound to do something, then the statute is money-mandating, provided the requirements of the statute and regulations are met.

This is the discussion in *Trifunovich* that is critical to the issue in this case:

> Defendant further argues that, since both statute and regulation contain *permissive rather than mandatory language*, denial of plaintiff's application for a living quarters allowance cannot, in light of the discretion thus vested in the Navy Department, be considered arbitrary or capricious. The argument lacks merit. *Plaintiff met the requirements of the Standardized Regulations*, and, but for its erroneous decisions to the contrary, the Navy admittedly would have paid him a living quarters allowance. *Plaintiff's right to recover flows, not from a showing of any abuse of discretion, arbitrariness or capriciousness, but from proof of deprivation of statutory and regulatory rights on an invalid basis.*

*Id.* at 311 (emphasis added). This passage informs the current analysis in a number of ways. First, the Court of Claims acknowledged the permissive language in the statute and regulation. Second, it recognized a set of requirements in the DSSR. Finally, the Court of Claims combined those two points to conclude that the ODAA and DSSR embody a legal scheme wherein the ODAA mandates payment of an LQA upon satisfaction of the conditions specified in the DSSR. This conclusion makes perfect sense in light of the statutory imperative that "[t]he allowances … authorized by this subchapter *shall* be paid *under regulations* prescribed by the President…" 5 U.S.C. § 5922(c) (emphasis added). Moreover, the conclusion is entirely in accord with the recent *Doe* decision, discussed above. *See Doe*, 463 F.3d at 1324.

That third point is particularly compelling in light of the addition of the CPMI to the calculus. The CPMI was created itself on the basis of a delegation of authority in the DSSR. The DSSR's delegating provision states, in relevant part, that such delegation is:

> *[S]ubject to the provisions of these regulations* [the DSSR] and the availability of funds. *Within the scope of these regulations*, the head of an agency may issue such further *implementing* regulations as he/she may

deem necessary for the guidance of his/her agency with regard to the granting of and accounting for these payments.

DSSR § 013 (emphasis added).

The most reasonable way of reading that provision is that agencies may decide exactly how to implement the DSSR, but it does not give them *carte blanche* to ignore it. This means that the CPMI is nothing more than an instruction on how to implement the DSSR within the context of the civilian component of the Department of Defense ("DoD"). Read from this perspective, the simple statement within the CPMI that LQAs "are not automatic salary supplements, nor are they entitlements," does not remove the CPMI from the ODAA's money mandate. Instead, it emphasizes that an employee must meet the criteria contained in the DSSR (and any that may be added by the DoD) before qualifying for an LQA.

The compliment to that conclusion is that the delegated-to authority may not simply remove the conditions for qualification under the DSSR. That would negate the need for regulations under the ODAA in the first place: what is the point of the President establishing regulations for payment of LQAs if those "regulations" effectively grant the DoD complete and unfettered authority to arbitrarily award LQAs? That simply does not make sense, and it is contrary to the conclusion in *Trifunovich* that the ODAA and its implementing regulations contemplate a money-mandating scheme.

Although the Court has concluded that *Trifunovich* decides the matter, the parties have mentioned a few other cases that are worth addressing. For reasons that should be obvious from the foregoing, the Court respectfully disagrees with at least part of each of these cases.

The earliest decision in the Court of Federal Claims that expressly addresses the CPMI in a jurisdictional context is *Striplin v. United States*, 100 Fed. Cl. 493 (2011). There, the court addressed a pair of different overseas allowances, but determined that the allowances were discretionary based on the plain language of the ODAA, the DSSR and the CPMI's language regarding entitlements. *See id.* at 500. *Trifunovich*, however, is not cited once in that opinion.

Less than one month after *Striplin*, the court reached the opposite conclusion, and the court had before it the same statute and regulations at issue in this case. Specifically, the court held that an LQA is an entitlement under the statute and DSSR. *See Thomas v. United States*, 2011 WL 9976337, *1 (Fed. Cl. Sept. 7, 2011).[3] Relying on the general provisions section of the ODAA, that court observed that "5 U.S.C. § 5922 states, '[t]he allowances and differentials authorized by this subchapter *shall* be paid under regulations prescribed by the President[.]'" *Id.* at *4 (emphasis added in *Thomas*). Turning to §5923, the court concluded that the "may be granted when applicable" language and

---

[3] The case does not refer to the CPMI by name, but it cites Department of Defense Instruction Manual 1400.25, which is the CPMI.

following conditions rendered the statute mandatory upon satisfaction of the conditions. *Id.* Finally, the CPMI was found invalid because it gave discretion where the DSSR "would otherwise mandate allowance." *Id.* As expressed above, this Court does not believe the CPMI is invalid, but it does agree with the conclusion in *Thomas* that the LQA provision in the ODAA is a money mandate.

Next, in *Roberts v. United States*, Civ. No. 10-754, the court had occasion to address the issue in two contexts. First, on the Government's motion to dismiss the plaintiff's LQA claim for lack of jurisdiction, the court determined, entirely based upon *Trifunovich*, that the ODAA and DSSR mandated award of an LQA upon satisfaction of the terms contained in those laws. *See Roberts v. United States*, 2011 WL 9975295, *1 (June 29, 2011) ("*Roberts I*"). The CPMI was not before the court when it decided the motion to dismiss.

The CPMI was placed squarely before that same court when the Government brought its motion for summary judgment. After a rather detailed analysis, the court determined that the CPMI "do[es] not 'mandate' the payment of money to plaintiff." *Roberts v. United States*, 104 Fed. Cl. 598, 604 (2012) ("*Roberts II*"). Given that the jurisdictional question was not before the court at this stage, and indeed, it had already been decided in the affirmative, this Court believes *Roberts II* is inapposite to the case at hand – the "mandate" language in *Roberts II* can be read simply as a conclusion that the plaintiff in that case did not win on the merits, i.e., the law did not mandate an award since he had not satisfied the necessary conditions to qualify for LQA. However, to the extent that the *Roberts* court determined that an agency operating under the DSSR's delegation may remove the money mandate, this Court respectfully disagrees: as it has already expressed, granting such authority to an agency eviscerates the scheme established by the ODAA and the DSSR, and it flatly contradicts the language of the DSSR's delegation provision.

In sum, this Court believes that *Trifunovich* is controlling on the question of whether the ODAA and its implementing regulations are money-mandating. The ODAA, DSSR and CPMI "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *White Mountain*, 537 U.S. at 472. Thus, this Court has jurisdiction over Stephan's case.

## IV.    Conclusion

For the foregoing reasons, the Government's motion to dismiss is DENIED. The parties shall file a joint status report by **July 31, 2013**. This report shall indicate how the parties wish to proceed and it shall indicate whether the stay on Plaintiff's motion for summary judgment should be lifted or left in place for the time being.

/s Edward J. Damich
EDWARD J. DAMICH
Judge

8